**BETTY G. WELDON REVOCABLE TRUST by Larry M. VIVION and Richard F. McGonegal as Co-Successor Trustees, et al., Defendants,**

v.

**Betty G. WELDON, by and Through Her Next Friend, et al.; Plaintiff; Frank WELDON; Sally Proctor; Appellant-Respondents, Lenore Weldon, Respondent-Appellant.**

Nos. WD 66078, WD 66079, WD 66113, WD 66114.

Missouri Court of Appeals, Western District.

May 29, 2007.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 31, 2007.

Application for Transfer Denied Sept. 25, 2007.

**164**

Anjali Gandhi, Jefferson City, MO, for plaintiff, Betty Weldon.

Charles W. Hatfield, Khristine A. Heisinger, Jefferson City, MO, for appellant-respondent, Frank Weldon.

Michael W. Bartolacci, Stephen E. Cupples, and Gilbert C. Sison, St. Louis, MO, for appellant-respondent, Proctor.

Dale C. Doerhoff, Matthew A. Clement, Timothy W. Van Ronzelen, Jefferson City, MO, for respondent-appellant, Lenore Weldon.

Larry Vivion, defendant, pro se.

Richard McGonegal, defendant, pro se.

Before LISA WHITE HARDWICK, P.J., ROBERT G. ULRICH, and THOMAS H. NEWTON, JJ.

ROBERT G. ULRICH, Judge.

Frank Weldon and Sally Proctor appeal the judgment of the trial court construing the Betty G. Weldon Revocable Trust and removing and replacing the successor trustees. Lenore Weldon cross-appeals challenging the trial court's removal of her as a successor trustee. The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded for entry of judgment consistent with this opinion.[1]

## FACTS

Betty G. Weldon, as Grantor, established the Betty G. Weldon Revocable Trust ("Trust") in September 1998. The Trust was amended in September 1999 and again in December 2000. The second amendment revoked the first amendment in its entirety so that the only two operative documents at the time of trial were the original 1998 trust agreement and the second amendment.

The beneficiaries of the Trust are Mrs. Weldon and her three children, Frank G. Weldon ("Gifford"), Sally Proctor ("Sally"), and Lenore T. Weldon ("Tony").[2] The Trust provides that while Mrs. Weldon is alive, she is entitled to receive all trust income and to withdraw principal. Should Mrs. Weldon become incapacitated, the co-successor trustees may apply net income and principal they deem appropriate for Mrs. Weldon's comfort, health, and general welfare. After Mrs. Weldon's death, the remaining Trust assets (after payment of debts, expenses, and taxes) shall be dis-

1. This case was argued and submitted on February 21, 2007. The court is informed that Betty G. Weldon died on April 17, 2007. The Betty G. Weldon Revocable Trust provides that the Trust assets are to be distributed following the death of Mrs. Weldon. Some of the parties assert that the issues presented survive Mrs. Weldon's death and directly or indirectly affect resolution of the Trust and distribution of the Trust assets. This opinion addresses the issues as they were presented before Mrs. Weldon's death and as though Mrs. Weldon were not deceased.

2. This opinion refers to the parties by their first names for brevity and clarity.

tributed to her three children, Gifford, Sally, and Tony, in equal shares.

Mrs. Weldon initially served as trustee of the Trust. She became incapacitated in 2001. Consequently, as provided in the Trust, Larry M. Vivion, Richard F. McGonegal, and Tony became co-successor trustees of the Trust.

Weldon Holding Company ("WHC") is an S–Corporation that owns 100 percent of various subsidiary corporations, News Tribune Company, California Democrat, Inc., and the Fulton Sun Gazette, Inc. Callaway Hills Stables, Inc. is a wholly owned subsidiary of the News Tribune. WHC has 100,000 outstanding shares of stock. The Trust owns all of the class A voting common stock—15,970 shares.[3] The two trusts of Mrs. Weldon's parents, the R.C. Goshorn Trust and the Lenore R. Goshorn Trust, own 84,030 shares of the WHC class B non-voting common stock. Mrs. Weldon holds a life estate in net income derived from her parents' trusts. After her death, her parents' trusts terminate, and all of the assets are to be distributed equally to her living lineal descendants, i.e., Gifford, Sally, and Tony. Consequently, all income of WHC is solely attributed to Mrs. Weldon and reported by her on her individual tax return. The board of directors of both WHC and the News Tribune consists of Gifford, Sally, Tony, Larry Vivion, Richard McGonegal, Robert Blosser, and Roman Patten.

The underlying lawsuit arose out of a dispute concerning the nature and scope of the future operations of Callaway Hills Stables. Callaway Hills is an American Saddlebred horse breeding and training farm located near New Bloomfield, Callaway County, Missouri, and founded by

Mrs. Weldon in the 1940s. Mrs. Weldon achieved great success with the stallion, Will Shriver, born in 1966. Will Shriver won the World Championship in 1976 and soon after retired from the show ring. He then became a successful breeding stallion at Callaway Hills Stables, siring numerous other champions. He died in 1991 but his sons, Blue Northern and Caramac, are still standing at stud on the farm, as well as some grandsons, and his lineage has made Callaway Hills Stables the most renowned American Saddlebred breeding farm in the United States, if not the world. Although making a profit of over $200,000 in 2004, Callaway Hills Stables sustained aggregate losses of over $26.5 million in the previous twenty-seven years despite its reputation.

Tony has lived at Callaway Hills farm for approximately twenty years, first in the farmhouse and later in a new house she built on land Mrs. Weldon transferred to her, which is surrounded by the farm. She has been around the farm all of her life and involved in all phases of its operation for the past twenty years. She is interested in maintaining the farm while her mother is still alive and after her death. Besides managing the farm, Tony is also the manager and publisher of the Fulton Sun Gazette newspaper.

On May 31, 2005, a majority of the board of directors of WHC decided to promptly close the breeding and training operations of Callaway Hills Stables and sell most of the horses at two dispersal sales in July 2005 and October 2005. The resolutions to close Callaway Hills Stables and sell the horses were proposed by Gifford due to his concern over the financial drain that he believed Callaway Hills Sta-

---

3. Tony and an accountant for WHC testified that the Trust is listed as the owner of 9,720 shares of WHC class A stock, and the William H. Weldon Trust is listed as owner of 6,250 shares of WHC class A stock, but the original Trust document lists all 15,970 shares of the class A stock of WHC as its property.

bles represented on the resources of the News Tribune. Tony testified at trial that she did not receive normal notice of the May 31, 2005, board meeting, and when she learned of the meeting, she arrived late to be surprised by Gifford's proposal. She left the meeting before the vote and, therefore, did not participate in the vote. Gifford, Sally, Mr. Vivion, Mr. McGonegal, and Mr. Patten voted in favor of the resolutions, and Mr. Glosser voted against them.

## PROCEDURAL HISTORY

Thereafter, Tony and Mrs. Weldon, by her next friend, filed suit against Mr. Vivion and Mr. McGonegal, individually and as co-successor trustees of the Trust, seeking a permanent injunction to enjoin the dispersal sale of the horses on July 13–15, 2005, and to enjoin the closing of operations and dissolution of Callaway Hills Stables. Mr. Vivion and Mr. McGonegal, as co-successor trustees of the Trust, and WHC subsequently filed their petition for declaratory judgment, naming Mrs. Weldon, Tony, Sally, and Gifford as parties, requesting the court to declare that they are charged with the obligation to preserve the Trust corpus and maximize the profitability of the Trust for the benefit of all of the beneficiaries and, consistent with that obligation, they may exercise their power to sell or dispose of any property or businesses owned by the Trust. The cases were consolidated.

Tony filed her answer to the petition for declaratory judgment and a counterclaim requesting the court to declare that Callaway Hills Stables not be sold or liquidated during Mrs. Weldon's life and that the three co-successor trustees are to manage the Trust in a manner that will fund the operations of Callaway Hills Stables for as long as Mrs. Weldon shall live as per Mrs. Weldon's and her parents' intentions as

evidenced by their respective trusts. She then filed a first amended petition, which essentially mirrored her counterclaim and which sued Mr. Vivion and Mr. McGonegal only in their capacities as co-successor trustees of the Trust.

Trial was held on Mr. Vivion and Mr. McGonegal's petition for declaratory judgment, Tony's counterclaim, and Tony's first amended petition. Following trial, the trial court entered its judgment concluding that Betty's intent under the Trust was that " 'Callaway Hills Stables' would remain intact and in operation for as long as she lived" and that it "would be available for distribution to one or more of her children upon the final distribution and termination of the Trust." Consequently, the trial court enjoined the proposed sale in October 2005 and enjoined Mr. Vivion, Mr. McGonegal, Gifford, and Sally from injecting themselves into the ongoing operations of Callaway Hills Stables to preserve the Trust assets until new co-successor trustees could effectively take charge. The court further removed Mr. Vivion, Mr. McGonegal, and Tony as co-successor trustees of the Trust. One reason cited for the removal of Mr. Vivion and Mr. McGonegal was their decision to pay Gifford and Sally each $150,000 per year to "match" the salary being paid to Tony. Next, the court appointed Eddie Barnett, the Honorable Byron L. Kinder, and Linda McAnany to serve in the vacancies. It ordered,

> If the Co–Successor Trustees, after being fully advised, determine that there is a reasonable risk of financial difficulties due to the increased obligations resulting from the new press and the new building, the Co–Successor Trustees are directed to present a plan to the Court of austerity measures for all the business operations of the Trust designed to alleviate any such risk of financial distress, which plan will take into account

Mrs. Weldon's intention that the training and breeding operations of 'Callaway Hills Stables' be preserved.

Finally, the court ordered the new co-successor trustees to take all actions necessary to bring all the assets of WHC and its subsidiaries within their effective control including the removal of any employee or director of WHC or its various subsidiaries.

Gifford, Sally, Tony, WHC, and Mr. Vivion and Mr. McGonegal, as co-successor trustees of the Trust, filed their respective notices of appeal. Mrs. Weldon, through her next friend, did not appeal. WHC's appeal and Mr. Vivion and Mr. McGonegal's appeal were dismissed. Thus, the only appeals remaining are those of Gifford, Sally, and Tony. Gifford and Sally are the designated appellants-respondents, and Tony is the designated respondent-appellant.

### POINTS ON APPEAL

Together, Gifford and Sally raise nine points on appeal.[4] First, they contend that the trial court lacked subject matter jurisdiction because necessary and indispensable parties were not named in the action, namely the trustees of the other trusts that own WHC stock. They also contend that the trial court erred in holding that Mrs. Weldon's intent alone, as expressed in the Trust, controlled the resolution of disputes concerning the business operations of WHC and Callaway Hills Stables because (1) the trial court ignored the interests of other shareholders of WHC and (2) the co-successor trustees' votes as members of the board of directors of WHC were protected by the business judgment rule. Additionally, they assert that the trial court exceeded its jurisdiction and authority in instructing the new successor trustees to take control of WHC.

Next, Gifford and Sally claim that the trial court erred in construing the Trust by (1) finding that the Trust prohibited the sale of Callaway Hills Stables rather than allowing the co-successor trustees to exercise their power and discretion to sell or dispose of trust assets and (2) relying on extrinsic evidence where the Trust was unambiguous.

In their next three points on appeal, Gifford and Sally contend that the trial court erred in removing and replacing the co-successor trustees of the Trust because (1) no party requested such action, (2) insufficient evidence to support their removal was presented, and (3) the court failed to follow statutory procedure for such action. Finally, they contend that the trial court erred in finding that the director's fees paid to them served no legitimate business purpose.

In her cross-appeal, Tony challenges only the trial court's removal of her as a co-successor trustee and its replacing Mr. Vivion and Mr. McGonegal instead of permitting her to serve as sole trustee.

### I. JURISDICTION— § 512.020 AGGRIEVED PARTIES

Initially, Tony asserts that this court does not have jurisdiction over Gifford and Sally's appeals because they are not aggrieved parties under section 512.020, RSMo Cum.Supp.2006. She contends that because Gifford and Sally are contingent remainder beneficiaries who are not entitled to receive anything from the Trust until Mrs. Weldon passes away, the judgment does not immediately operate direct-

---

4. The points on appeal are not necessarily addressed in the order presented, and some are addressed together.

ly and prejudicially on their personal or property rights or interests.

To assert an appeal from a trial court's judgment, the appellant must have been a party to a suit and aggrieved by the judgment. § 512.020; *Houston v. Zaner*, 683 S.W.2d 277, 282 (Mo.App. W.D.1984). A party who has not been aggrieved by a judgment has no standing to appeal. *Jackson County Bd. of Election Comm'rs v. Paluka*, 13 S.W.3d 684, 687 (Mo.App. W.D.2000). "A party is 'aggrieved' when the judgment operates prejudicially and directly on his personal or property rights or interest and such is an immediate and not merely a possible remote consequence." *Stockman v. Safe–Skin Corp.*, 36 S.W.3d 447, 449 (Mo.App. E.D.2001).

Tony cites *Columbia Union National Bank & Trust v. Bundschu*, 641 S.W.2d 864 (Mo.App. W.D.1982), in arguing that Gifford and Sally have no standing to appeal the trial court's judgment construing the Trust because they are, at best, only potential beneficiaries and not entitled to any present income from the Trust. In *Bundschu*, the trial court approved a settlement agreement between trust beneficiaries of a dispute concerning the construction of a trust created as a component of a will. *Id.* at 872. A nephew and heir of the decedent appealed the judgment, and the beneficiaries of the trust argued that he was not an aggrieved party and moved for the dismissal of his appeal. *Id.* This court found that where the heir did not contest the validity of the trust, was not a beneficiary of the trust, and could not receive any benefits from the trust under any interpretation of it, he was not aggrieved by the judgment approving the settlement agreement between the beneficiaries. *Id.* at 873–75. Tony relies on this court's explanation in *Bundschu*, "A residuary legatee, heir, or other person has no status to appeal the construction of a tes-

tamentary trust where the terms, even if adjudicated in favor of contention, confer no pecuniary benefit on the litigant." *Id.* at 873.

The facts of *Bundschu* are, however, distinguishable from this case. The heir in *Bundschu* was not a beneficiary under the trust in that case. The appellants, Gifford and Sally, on the other hand, are beneficiaries under the Trust here. Generally, beneficiaries are necessary parties in suits involving trust property because they have a beneficial or equitable interest in the trust. *Roth v. Lehmann*, 741 S.W.2d 860, 862 (Mo.App. E.D.1987). Where a petition presents issues of conduct of the trustees, their handling of the trust, or the removal of a trustee, the beneficiaries have an interest in those determinations and are, thus, necessary parties in the suit. *Id.* Where a judgment adversely affects the interests of the beneficiaries, they are aggrieved and have standing to appeal the judgment. Specifically, Missouri cases have held that beneficiaries of a trust are parties aggrieved by an award of attorney fees against the trust and a fee award to the guardian to be paid from the estate in final settlement. *St. Louis Union Trust Co. v. Fitch*, 354 Mo. 638, 190 S.W.2d 215, 217 (Mo.1945); *Houston*, 683 S.W.2d at 282. If such issues involving trust property or trustee conduct not only affect the income-producing potential of the trust but the residuary corpus thereof, the residuary beneficiaries are also necessary parties to the litigation as well as the income beneficiaries. *Roth*, 741 S.W.2d at 862. It follows that where a judgment adversely affects the residuary beneficiaries' interests in the corpus of the trust, they too are aggrieved parties with standing to appeal.

The Missouri Uniform Trust Code, sec-

tions 456.1–101 to 456.11–1106,[5] which became effective January 1, 2005, provides support for this proposition that a residuary beneficiary may have standing to appeal a judgment construing a trust. Under the MUTC, a "beneficiary" is defined as "a person that has a present or future beneficial interest in a trust, vested or contingent." § 456.1–103(3)(a). A "qualified beneficiary" is:

a beneficiary who, on the date the beneficiary's qualification is determined:

(a) is a permissible distributee;

(b) would be a permissible distributee if the interests of the permissible distributees described in paragraph (a) of this subdivision terminated on that date; or

(c) would be a permissible distributee if the trust terminated on that date.

§ 456.1–103(20). A "permissible distributee" is "a beneficiary who is currently eligible to receive distributions of trust income or principal, whether mandatory or discretionary." § 456.1–103(15).

"Qualified beneficiary" is a new term added to Missouri trust law with the adoption of the MUTC. Qualified beneficiaries consist of the beneficiaries currently eligible to receive a distribution from the trust as well as what the Uniform Trust Code comment refers to as first-line remaindermen. 4C Francis M. Hanna, Missouri Practice, Trust Code and Law Manual § 456.1–103 Author's Comment (2007). First-line remaindermen are beneficiaries who, as of a critical date, are next in line to receive distributions on the termination of a qualified beneficiary's interest or of the trust. *Id.* Commonly, where income is left to a beneficiary for life with the remainder to a different beneficiary, that remainder

beneficiary is a first-line remainderman and, therefore, a qualified beneficiary. *Id.*

The MUTC creates certain rights in qualified beneficiaries and corresponding duties and potential liabilities for the trustee. *Id.* For instance, qualified beneficiaries must be kept "reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." § 456.8–813.1(1). All beneficiaries of the trust, regardless whether qualified, are entitled to request and receive reports from the trustee concerning trust property, liabilities, receipts, disbursements including the source and amount of the trustee's compensation, and a listing of trust assets and their market value. § 456.8–813.3. Qualified beneficiaries may also request the court to remove a trustee, § 456.7–706.1, and subject to contrary provisions in the trust, appoint, by a majority in number, a successor trustee. § 456.7–704.3(2). Given the MUTC's recognition of these interests in first-line remaindermen qualified beneficiaries, holding that the qualified beneficiaries do not have standing to appeal a judgment adversely affecting these interests would be illogical.

The Trust in this case provides that, during her life, Mrs. Weldon is entitled to receive all trust income and to withdraw principal. Mrs. Weldon is a permissible distributee and, thus, a qualified beneficiary under the MUTC. After Mrs. Weldon's death, the remaining Trust assets shall be distributed to her three named children in equal shares. Although they are residuary beneficiaries, Gifford, Sally, and Tony are first-line remaindermen under the Trust and, thus, are also qualified beneficiaries under section 456.1–103(20)(b). The judgment construes the trust and affects trust property, the income-producing

---

**5.** All statutory references to the Missouri Uniform Trust Code (MUTC), sections 456.1–101 to 456.11–1106, are to RSMo Cum.Supp.2006 unless otherwise indicated.

potential of the trust, and the residuary corpus of the trust. The judgment operates immediately and directly on the rights and interests of all of the qualified beneficiaries, both the income beneficiary of the trust, Mrs. Weldon, and the residuary beneficiaries, Gifford, Sally, and Tony. *See Roth,* 741 S.W.2d at 862. Gifford and Sally are, therefore, aggrieved parties with standing to appeal the trial court's judgment.

## II. TRUST LAW v. CORPORATE LAW

Four of Gifford's and Sally's points on appeal raise the issue of whether trust law or corporate law applies in this case. First, they contend that the trial court lacked subject matter jurisdiction to resolve the dispute in this case because necessary and indispensable parties were not named in the action. Specifically, they argue that the other shareholders of WHC, namely the trustees of the William H. Weldon Trust, the Robert C. Goshorn Trust, and the Lenore R. Goshorn Trust, whose collective ownership of WHC stock is 90.28%, were necessary and indispensable parties. They also contend that the trial court erred in holding that Mrs. Weldon's intent alone, as expressed in the Trust, controlled the resolution of disputes concerning the business operations of WHC and, specifically, Callaway Hills Stables, because (1) the court ignored the interests of the other shareholders of WHC and (2) the co-successor trustees' votes as members as the WHC board of directors were protected by the business judgment rule. Finally, Gifford and Sally assert that the trial court exceeded its jurisdiction and authority in instructing the new co-successor trustees to take control of WHC. In its judgment, the trial court ordered that:

the new Co–Successor Trustees are empowered to take all actions necessary to bring all assets of Weldon Holding Company and its subsidiaries within their effective control, including the removal of any or all employees of the Weldon Holding Company or its various subsidiaries, and any or all children of Mrs. Weldon from the Board of Directors of Weldon Holding Company and its various subsidiaries.

They argue that such order ignores corporate formalities and violates Missouri corporate law.

■ Contrary to Gifford and Sally's contentions, however, the standards imposed under trust law are applicable in this case rather than standards under corporate law or the business judgment rule. This case involves a dispute among the co-successor trustees of the Trust about the disposition of certain Trust assets, namely Callaway Hills Stables. Mrs. Weldon, by her next friend, and Tony, one of the three co-successor trustees, sued Mr. Vivion and Mr. McGonegal, the other two co-successor trustees, seeking a permanent injunction to enjoin the dispersal sale of horses and the closing of operations and dissolution of Callaway Hills Stables. Mr. Vivion and Mr. McGonegal subsequently filed their petition for declaratory judgment against Mrs. Weldon, Tony, Sally, and Gifford requesting the court to declare that they may exercise their power to sell or dispose of any property or business owned by the Trust. Tony then counterclaimed asking the court to declare that Callaway Hills Stables not be sold during Mrs. Weldon's life and that the three co-successors are to manage the Trust in a manner that will fund the operations of Callaway Hills for as long as Mrs. Weldon lives as per her intentions under the Trust. All pleading in this case framed the issue involved as a dispute among the three co-successor trustees regarding the future of Callaway Hills Stables. Mr. Vivion and Mr. McGonegal

contended that they had an obligation to preserve the Trust corpus and to maximize the profitability of the Trust for the benefit of all the beneficiaries while Tony maintained that under the Trust, the horse breeding business should remain in operation for as long as Mrs. Weldon lived. Simply stated, this case is one of construction of a trust.

An action to construe a trust is, in essence, a declaratory judgment action. *Commerce Bank, N.A. v. Blasdel,* 141 S.W.3d 434, 456 (Mo.App. W.D.2004). Rule 87.04 and section 527.110, RSMo 2000, provide, "When declaratory relief is sought, all persons shall be made parties who have or claim any interest which would be affected by the declaration, and no declaration shall prejudice the rights of persons not parties to the proceedings." A person is a necessary party if he claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may, as a practical matter, impair or impede his ability to protect that interest. *Citizens Ins. Co. of Am. v. Leiendecker,* 962 S.W.2d 446, 450 (Mo.App. E.D.1998). "The presence of an indispensable party is a jurisdictional requirement." *Bauer v. Bd. of Election Comm'rs,* 198 S.W.3d 161, 164 (Mo.App. E.D.2006). The failure to join an indispensable party to the trial court proceeding is fatal to that court's judgment. *Id.*

As previously mentioned, in a case construing a trust, all trustees and beneficiaries are necessary parties. *Roth,* 741 S.W.2d at 862. All of the trustees of the Trust, Mr. Vivion, Mr. McGonegal, and Tony, and all of the beneficiaries of the Trust, Mrs. Weldon, Gifford, Sally, and Tony, were necessary parties and participated in the underlying action. The trustees of the trusts of Mrs. Weldon's parents were not necessary and indispensable parties in this case.

Furthermore, Gifford and Sally's contention that the co-successor trustees' votes as members of the board of directors were protected by the business judgment rule is without merit. "The business judgment rule protects the directors and officers of a corporation from liability for *intra vires* decisions within their authority made in good faith, uninfluenced by any other consideration than the honest belief that the action subserves the best interests of the corporation." *Nixon v. Lichtenstein,* 959 S.W.2d 854, 858 (Mo. App. E.D.1997)(quoting *McKnight v. Midwest Eye Inst. of Kansas City, Inc.,* 799 S.W.2d 909, 913 (Mo.App. W.D.1990)). Where a corporate director or officer's decision falls within the business judgment rule, the court will not interfere with that decision. *Id.*

Again, trust law is applicable in this case rather than the business judgment rule. Upon incorporation of trust assets, the corporation becomes the alter ego of the trustees and as such, the propriety of the trustee's acts must be determined in the light of the trust and must be controlled by the provisions of the trust. *Hillyard v. Leonard,* 391 S.W.2d 211, 223 (Mo.1965); *Nixon,* 959 S.W.2d at 858. Consistent with this principle, section 456.8–802 of the MUTC governs the trustee's duty of loyalty to administer the trust solely in the interests of the beneficiaries. Subsection 7 addresses the overlap between corporate and trust law, 4C FRANCIS M. HANNA, MISSOURI PRACTICE, TRUST CODE AND LAW MANUAL § 456.8–802 UTC Comment (2007), and provides the statutory mandate to trustees holding stock:

> In voting shares of stock or in exercising powers of control over similar interests in other forms of enterprise, the trustee shall act in the best interests of the

beneficiaries. If the trust is the sole owner of a corporation or other form of enterprise, the trustee shall elect or appoint directors or other managers who will manage the corporation or enterprise in the best interests of the beneficiaries.

§ 456.8–802.7. The subsection is based on section 193 comment a of the Restatement (Second) of Trusts, which discusses the duty of a trustee in voting shares of stock. It provides, in pertinent part:

It is the duty of the trustee in voting shares of stock to use proper care to promote the interest of the beneficiary. . . . Where the trustee holds as trustee such a large proportion of the shares of a corporation that he is in control or substantially in control of the corporation, his responsibility with respect to the voting of the shares is heavier that it is where he holds only a small fraction of the shares.

RESTATEMENT (SECOND) OF TRUSTS § 193 cmt. a (1959).

 A majority of the assets of the Trust in this case consist of class A common stock of WHC. WHC has 100,000 outstanding shares of stock. The Trust owns all of the class A voting common stock—15,970 shares. The two trusts of Mrs. Weldon's parents, the R.C. Goshorn Trust and the Lenore R. Goshorn Trust, own 84,030 shares of the WHC class B non-voting common stock. While the Trust did not own 100% of the outstanding common stock of WHC, it did own 100% of the outstanding voting common stock of the company. With such stock ownership, the co-successor trustees of the Trust exercised control of WHC through use of their voting power to elect the board of directors and, thus, control its business decisions and assets.[6] Thus, the co-successor trustees had a duty under section 456.8–802.7 to vote the shares in accordance with the provisions of the Trust to promote the interests of the beneficiaries of the Trust, specifically by electing a board of directors who will manage the corporation in the best interests of the beneficiaries. Furthermore, the trial court's order concerning the new co-successor trustees "taking control" of WHC merely synopsized the duty of trustees holding stock as set out in the MUTC and, therefore, was not error. The points are denied.

## III. CONSTRUCTION OF TRUST

Next, Gifford and Sally challenge the trial court's construction of the Trust. They contend that the trial court erred in construing the Trust as prohibiting the sale of Callaway Hills Stables rather than allowing the co-successor trustees to exercise their power and discretion to sell or dispose of trust assets. They also claim that the trial court erred in relying on extrinsic evidence where the Trust was unambiguous.

---

6. Gifford and Sally contend that a majority shareholder has a fiduciary obligation to minority shareholders and, thus, the co-successor trustees of Mrs. Weldon's Trust could not use their position to force the continuation of Callaway Hills when doing so would be a detriment to the other shareholders. They are correct that majority shareholders owe a fiduciary duty to minority shareholders, *Peterson v. Cont'l Boiler Works, Inc.*, 783 S.W.2d 896, 904 (Mo. banc 1990), and that the law imposes equitable limitations on the rights of controlling shareholders to act in their own self-interest. *Fix v. Fix Material Co.*, 538 S.W.2d 351, 358 (Mo.App.1976). However, the co-successor trustees' voting their shares of WHC to promote the best interests of the beneficiaries of the Trust is not, by that act alone, a breach of fiduciary duty without evidence that they are using their control to obtain a profit for themselves at the injury of the minority or to produce corporate action that is designed to operate unfairly to the minority. *See Fix*, 538 S.W.2d at 358.

■■ "[A] court of equity has the inherent power to 'exercise jurisdiction over trust estates, to supervise their administration, and to make all orders necessary for their preservation and conservation.' " *Williams v. Duncan ex rel. Pauline M. Babcock, Living Trust,* 55 S.W.3d 896, 901 (Mo.App. S.D.2001)(quoting *Riggs v. Moise,* 344 Mo. 177, 128 S.W.2d 632, 634 (Mo. banc 1939)). Any interested person in the administration of a trust may file a declaratory judgment seeking a declaration of rights or legal relations to ascertain heirs, to direct a trustee, or to determine any questions arising in the administration of the trust, including questions of construction. Rule 87.02(b); § 527.040, RSMo 2000. Furthermore, section 456.2–201.1 of the MUTC, provides that a "court may intervene in the administration of a trust to the extent its jurisdiction is invoked by an interested person or as provided by law." In very expansive terms, section 456.2–202.3 provides:

A judicial proceeding involving a trust may relate to any matter involving the trust's administration, including, but not limited to a proceeding to:

(1) request instructions or declare rights;

. . . .

(3) interpret or construe the terms of the trust;

. . . .

(6) direct a trustee to refrain from performing a particular act or grant to a trustee any necessary or desirable power;

(7) review the actions of a trustee, including the exercise or a discretionary power;

. . . .

(9) appoint or remove a trustee;

. . . .

(16) determine the propriety of investments or of principal and income allocations.

## STANDARD OF REVIEW

■■ The standard of review in a case seeking declaratory judgment is the same as in any other court-tried case. *Blasdel,* 141 S.W.3d at 442 (quoting *Kerperien v. Lumberman's Mut. Cas. Co.,* 100 S.W.3d 778, 780 (Mo. banc 2003)). Thus, an appellate court will affirm the judgment of the trial court unless no substantial evidence supports it, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* (quoting *Murphy v. Carron,* 536 S.W.2d 30, 32 (Mo. banc 1976)). An appellate court will conduct *de novo* review of questions of law, which includes determination of the meaning of a trust instrument, and give no deference to the trial court's judgment in such matters. *Id.* (quoting *H & B Masonry Co. v. Davis,* 32 S.W.3d 120, 124 (Mo. App. E.D.2000)); *In re Nelson,* 926 S.W.2d 707, 709 (Mo.App. S.D.1996).

■■ Generally, the rules concerning the construction of wills apply to the construction of trusts. *Id.* at 443 n. 9. The paramount rule of construction in determining the meaning of a trust provision is that the grantor's intent is controlling. *Id.* at 443 (quoting *First Nat'l Bank of Kansas City v. Hyde,* 363 S.W.2d 647, 652 (Mo.1962)); *Feinberg v. Adolph K. Feinberg Hotel Trust,* 922 S.W.2d 21, 25 (Mo. App. E.D.1996). The court must endeavor to ascertain the grantor's intent at the time of the creation of the trust. *Blasdel,* 141 S.W.3d at 443. Furthermore, the grantor's intention must be ascertained primarily from the trust instrument as a whole, and no clause in the trust is given undue preference. *Id.; Nelson,* 926 S.W.2d at 709. A grantor is presumed to know and intend the legal effect of the

language she uses in the trust. *Blasdel*, 141 S.W.3d at 444; *Nelson*, 926 S.W.2d at 709.

 The unambiguous terms of a trust will be given effect, and extrinsic evidence as to the grantor's intent will not be permitted to qualify, explain, enlarge, or contradict the terms of the instrument. *Blasdel*, 141 S.W.3d at 444 (quoting *Hyde*, 363 S.W.2d at 653). And a court will not attempt to rewrite an unambiguous trust under the guise of construction. *Id.*

## ANALYSIS

As discussed previously, Mr. Vivion and Mr. McGonegal's contention at trial was that they had an obligation to preserve the Trust corpus and to maximize the profitability of the Trust for the benefit of all the beneficiaries. On appeal, Gifford and Sally argue that the Trust instrument unambiguously grants the co-successor trustees the power and discretion to sell or dispose of trust assets. On the other hand, Tony maintained at trial, and on appeal, that under the Trust, the horse breeding business should remain in operation for as long as Mrs. Weldon lived.

Gifford and Sally rely on two provisions of the Trust in arguing that Mrs. Weldon intended to provide the broadest possible power and discretion to the co-successor trustees in the administration of the Trust, specifically to sell Callaway Hills Stables. Item 7C gives the trustee the power and discretion "[t]o sell, exchange, assign, transfer, lease (for terms extending beyond the termination of the trust or otherwise), pledge, mortgage, rent, option and otherwise deal with or dispose of any property." Item 7K gives the trustee the power and discretion "[t]o participate in any way in the organization, continuation, operation, discontinuance or dissolution of businesses in corporate or other form." These provisions are conferred upon the co-successor trustees as discretionary powers. Tony relies on Paragraph 2 of Item 4C of the Second Amendment to Trust Agreement regarding distribution of the remaining estate after Mrs. Weldon's death in arguing that Mrs. Weldon intended that Callaway Hills Stables remain in operation for as long as she lived. That paragraph provides:

Distribution of the Residue of the Trust Estate. The remaining Trust estate shall be distributed to the Grantor's three children, in equal shares, per stirpes when it is practicable to do so, after winding up the affairs of the Grantor and the Trust. Prior to making any significant distributions, or terminating this Trust, the Successor Trustees must make adequate arrangements for the horses at Callaway Hills. Adequate arrangements include, but are not limited to, making provisions for all horses so that none are slaughtered. The Successor Trustees should consult with Bob Bryson and Kenda Benn in making such arrangements provided they are employed at Callaway Hills at the time. Once such arrangements have been made and the other affairs of the Grantor and this Trust have been concluded, then the Successor Trustees shall distribute the remainder of the trust estate, and this Trust shall then terminate. The decision of when the Grantor's affairs and the affairs of this Trust have been finally concluded, including the aforesaid arrangement for the horses at Callaway Hills, so that distribution may be made, shall vest in the sole and absolute discretion of the Successor Trustees.

 Generally, where a grantor vests sole discretion of a matter in a trustee, a court will not interfere in the exercise of that discretion unless the trustee willfully abuses his discretion or acts arbi-

trarily, fraudulently, dishonestly, or with an improper motive. *In re Heisserer*, 797 S.W.2d 864, 870 (Mo.App. S.D.1990). If the trust, however, supplies a standard by which to evaluate the reasonableness of the trustee's conduct, a court will interfere with the trustee's exercise of a power when he acts beyond the bounds of reasonable judgment. *Id.*

■ Additionally, a trust may contain a general power of sale and except particular property from that power. *Id.* at 873. In other words, a trust asset may not be sold pursuant to a general power of sale contained in a trust when such sale would defeat an express purpose of the trust. *Id.* at 872–73.[7] Such was the case in *St. Louis Union Trust Co. v. Brug*, 558 S.W.2d 375 (Mo.App.1977). In *Brug*, a testamentary trustee sought court approval to sell three tracts of real estate described in the will. *Id.* at 376. Two tracts were producing no income, and the third tract was producing only minimal income; therefore, the trustee believed that sale of the real estate and investment of the proceeds in income producing property would be in the best interest of the trust. *Id.* The testatrix, however, had made specific provisions for distribution of the net income produced by the tracts and for the ultimate disposition of the property upon the death of specified beneficiaries. *Id.* at 377. The court ruled that inasmuch as the testatrix made specific provision for this property, she did not intend to grant the trustee the power to sell the property under the general powers of sale provisions of the trust even though such sale might be economically wise. *Id.* at 377–78.

■ The case *sub judice* is very similar to *In re Heisserer*, 797 S.W.2d 864 (Mo. App. S.D.1990). In *Heisserer*, the grantor established a revocable inter vivos trust in 1983 nominating herself as the trustee and naming a bank and two individuals as co-successor trustees should she become incapacitated. *Id.* at 865. The grantor and her fifty-five-year-old disabled daughter were the primary beneficiaries of the trust. *Id.* at 870. Specifically, the trust directed the trustee to distribute so much of the income and principal of the trust as is desirable for the maintenance, support, general welfare, and health of the grantor and her daughter. *Id.* at 871. The grantor was declared incapacitated in 1987, and the bank and individuals named in the trust became the co-successor trustees. *Id.* at 866–67.

One of the assets of the trust in *Heisserer* was a 180–acre farm, which was the subject of the controversy and which constituted one-fourth of the corpus of the trust. *Id.* at 867. The farm was leased to Harl Friedrich from 1973 to 1988, and he farmed it under a sharecropper agreement. *Id.* Mr. Friedrich was one of the co-successor trustees. *Id.* at 866. The evidence revealed that the farm operation was inherently risky because the farm was located in close proximity to the Mississippi River and was subject to flooding. *Id.* at 867. During periods of high water, the landlord and tenant were subjected to a total loss of their crop. *Id.* Mr. Friedrich nonetheless operated the farm quite successfully from 1983 to 1988, despite flooding in 1982, 1983, 1985, and 1986. *Id.* But because of the inherent risk involved in the farm's operation, the bank and other individual co-successor trustee decided to sell

7. *See also Hyde,* 363 S.W.2d at 652 (In discussing will's provision regarding investment powers of the trustees, the Missouri Supreme Court explained, "A trustee would not be justified in continuing to hold an investment made by the settlor if sound business judgment dictated that it should be disposed of and the proceeds reinvested unless the trust instrument contains a positive direction that such investment must be retained.")

it at auction and sought construction of the trust by the probate court. *Id.* at 868. Mr. Friedrich objected to the sale of the farm because the trust provided that after the deaths of the grantor and her daughter, Mr. Friedrich shall have the right, provided he is farming the farm, to purchase it at two-thirds of the fair market value. *Id.* at 866. The trial court found that the grantor's intent under the terms of the trust prohibited the sale of the farm and that Mr. Friedrich be allowed to continue to rent the farm either as a share-cropper or a cash tenant. *Id.* at 869, 873.

On appeal, the bank and other co-successor trustee argued that the overriding purpose of the trust was to provide for the needs of the grantor and her daughter, and they were authorized and empowered by the trust to do whatever was necessary to provide for their needs. *Id.* at 870. The Southern District found that the trust provision regarding providing for the grantor and her daughter limited the co-successor trustees' discretion under the general power of sale provision to that of reasonable necessity. *Id.* at 871. Additionally, the court found that the grantor's intent to give Mr. Friedrich the right to purchase the farm after her and her daughter's deaths further limited the co-successor trustees' discretion under the general power of sale provision unless sale of the farm were reasonably necessary to carry out the primary purpose of the trust. *Id.* at 872–73. Because the evidence demonstrated no necessity to sell the farm to produce income to provide for the grantor and her daughter, the court affirmed the trial court's judgment prohibiting the sale of the farm. *Id.* at 873.

In this case, Mrs. Weldon is the primary beneficiary under the Trust, which provides that while Mrs. Weldon is alive, she is entitled to receive all trust income and to withdraw principle. Like in *Heisserer,*

upon Mrs. Weldon's incapacitation; the primary purpose of the Trust is to provide for her needs. Such purpose is evinced by Item 2D of the Trust. Item 2D provides, in pertinent part:

> During any period in which the Grantor is under legal disability or is, in the judgment of the Co–Successor Trustees, incapacitated, the Co–Successor Trustees may use and apply such amounts of net income and principal as they consider appropriate:
>
> 1. For the comfort, health and general welfare of the Grantor and children dependent upon the Grantor for support.

The co-successor trustees' general power to sell trust assets is limited by this primary purpose of the trust and the standard outlined in it—to apply such amounts of income and principal as considered appropriate for Mrs. Weldon's comfort, health, and general welfare. The general power of sale is further limited by the exception of particular property, namely Callaway Hills Stables, from that power in Paragraph 2 of Item 4C. The language in such provision concerning the making of adequate arrangements for the horses at Callaway Hills before making any significant distributions or terminating the Trust after her death demonstrates Mrs. Weldon's intent that Callaway Hills Stables would be in operation and an asset of the trust upon her death. A sale of Callaway Hills Stable during Mrs. Weldon's life might be authorized, however, if such sale were necessary to enable to the co-successor trustees to carry out the primary purpose of the Trust, to appropriately provide for Mrs. Weldon. *See Id.* No such necessity was demonstrated in this case.

Undisputed evidence was offered that it costs approximately $300,000 per year to appropriately provide for Mrs. Weldon's comfort, health, and general welfare. The

evidence showed that in 2004, WHC had a net income of $2.4 million with Callaway Hills Stables making a profit of over $200,000 itself despite its previous losses over the years. Tony presented the testimony of a CPA who projected that although Callaway Hills Stables could sustain losses of approximately $800,000 per year during 2005, 2006, and 2007 while the breeding operation was stabilizing from the lack of training of horses and lack of sales during the pendency of this case, it could sustain net income after depreciation of over $550,000 per year in 2008 and thereafter. The 2005 projected net income for the News Tribune Company was $2.3 million. No evidence was offered regarding the projected net income of the other companies owned by WHC. Mr. Vivion testified regarding the purchase of a new building and printing press by News Tribune and how the loan service on that purchase would substantially reduce the income of News Tribune making it unfeasible to continue to operate Callaway Hills Stables. He stated that the debt service for the building and press would be approximately $1.4 million a year, but he admitted that he did not consider the added income potential from the new press or the tax benefits it would provide in weighing the continued operation of the horse breeding farm. Consequently, Mr. Vivion and Mr. McGonegal failed to demonstrate at trial that the sale of Callaway Hills Stables was necessary to appropriately provide for Mrs. Weldon's comfort, health, and general welfare. The trial court did not err in construing the Trust as prohibiting the sale of Callaway Hills Stables during Mrs. Weldon's life.

The trial court further found that the Trust, specifically Paragraph 2 of Item 4C, also shows Mrs. Weldon's intent that Tony carry on the operation of Callaway Hills Stables after her death. While the language of such provision does demonstrate Mrs. Weldon's intent that the horse breeding operation remains intact during her life, it does not compel distribution of Callaway Hills Stables to a beneficiary upon final distribution of Trust assets. Obviously, if Callaway Hills Stables is in operation upon Mrs. Weldon's death, it might be available for distribution to a beneficiary; however, the Trust document does not specifically provide for such action.

In the judgment, the trial court makes several findings regarding extrinsic evidence and Mrs. Weldon's intent, which Gifford and Sally argue was error because the Trust was unambiguous. In its findings of fact in the judgment, the trial court found the following facts:

Mrs. Betty G. Weldon told Red Crabtree that she hoped Tony Weldon (Lenore T. Weldon) would carry on "Callaway Hills Stables" after she was gone. Red Crabtree testimony.

When Fred Sarver was interviewing with Mrs. Weldon for the job of farm manager at "Callaway Hills Stables," and expressed his concerns to her about his future with the farm in case something happened to her, she told him she was sure that Tony Weldon would keep the farm going. Fred Sarver testimony.

The trial court also noted in a conclusion of law:

Considerable weight should be given to Betty G. Weldon's pattern of spending on the farm. Her willingness to use money from News Tribune profits to underwrite the operating losses at the farm is beyond dispute. The fact that she continued to do this after she established the Weldon Trust and served as sole Trustee shows that her generous intentions toward the horses did not change because of any terms of the Trust Agreement.

As stated, extrinsic evidence as to the grantor's intent will not be permitted to qualify, explain, enlarge, or contradict the terms of an unambiguous instrument. *Blasdel*, 141 S.W.3d at 444 (quoting *Hyde*, 363 S.W.2d at 653). Although the trial court did make such findings regarding extrinsic evidence, it also explained that it "did not have to resort to any parol evidence to ascertain Mrs. Weldon's intentions, because such intentions are clearly evident from the Trust Agreement as a whole." To the extent that the trial court found relevant certain evidence concerning Mrs. Weldon's intent that Callaway Hills Stables remain in operation during her life, such findings were harmless because they did not contradict what the Trust document showed. To the extent, however, that the trial court relied on extrinsic evidence in concluding that the Trust also shows Mrs. Weldon's intent that Tony would carry on the horse breeding operation after her death, the trial court erred because such intent is not shown by the Trust as discussed above, and extrinsic evidence of such intent will not be permitted to enlarge the terms of the unambiguous Trust in this case.

## IV. REMOVAL AND REPLACE-MENT OF CO–SUCCESSOR TRUSTEES

In their next three points on appeal, Gifford and Sally contend that the trial court erred in removing and replacing the co-successor trustees of the Trust because (1) no party requested such action, (2) insufficient evidence to support their removal was presented, and (3) the court failed to follow statutory procedure for filling a vacancy in a trusteeship. Finally, they contend that the trial court erred in finding that the director's fees paid to them served no legitimate business purpose. In her cross-appeal, Tony challenges only the trial court's removal of her as a co-successor trustee and its replacing Mr. Vivion and Mr. McGonegal instead of permitting her to serve as sole trustee.

The power of a court to remove a trustee should be used sparingly. *Williams*, 55 S.W.3d at 902 (quoting *Guirl v. Guirl*, 708 S.W.2d 239, 244 (Mo.App. E.D.1986)). Before such power is exercised, misconduct showing want of capacity or of fidelity jeopardizing the trust must be evident. *Shelton v. McHaney*, 343 Mo. 119, 119 S.W.2d 951, 954 (Mo. banc 1938) (quoting 1 PERRY ON TRUSTS § 276 notes 93, 94 (7th ed.)); *Williams*, 55 S.W.3d at 902 (quoting *Guirl*, 708 S.W.2d at 244). A court will less readily remove a trustee named by the grantor, especially on a ground existing at the time of the appointment and known by the grantor. *Shelton*, 119 S.W.2d at 954 (quoting RESTATEMENT OF TRUSTS § 107(a), cmt. f (1935)). "The removal of a trustee calls for the exercise of sound judicial discretion, which should not be abused." *Id.*

Section 456.7–706 of the MUTC governs the removal of a trustee. Subsection 1 provides, "The settlor, a cotrustee, or a qualified beneficiary may request the court to remove a trustee, or a trustee may be removed by the court on its own initiative." § 456.7–706.1. Although no party asked for removal of the co-successor trustees in this case, the trial court had authority under section 456.7–706.1 to remove the co-successor trustees on its own initiative.

Subsection 2 of the statute provides the grounds for removal of a trustee:

The court may remove a trustee if:

(1) the trustee has committed a serious breach of trust;

(2) lack of cooperation among cotrustees substantially impairs the administration of the trust;

(3) because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee serves the best interests of the beneficiaries; or

(4) the trustee has substantially and materially reduced the level of services provided to that trust and has failed to reinstate a substantially equivalent level of services within ninety days after receipt of notice by the settlor, a cotrustee, or a qualified beneficiary or removal is requested by all of the qualified beneficiaries and in either such case the party seeking removal establishes to the court that:

(a) removal of the trustee best serves the interests of all of the beneficiaries;

(b) removal of the trustee is not inconsistent with a material purpose of the trust; and

(c) a suitable cotrustee or successor trustee is available and willing to serve.

§ 456.7–706.2.

In removing Mr. Vivion and Mr. McGonegal as co-successor trustees, the trial court cited three grounds—serious breach of trust, section 456.7–706.2(1); "lack of cooperation among co-trustees (that) substantially impairs the administration of the trust," section 456.7–706.2(2); and "unwillingness, or persistent failure of the trustee to administer the trust effectively," section 456.7–706.2(3).

■■■■ A breach of trust is a violation by a trustee of a duty the trustee owes to a beneficiary. § 456.10–1001.1. Not every breach of trust warrants removal of a trustee; the breach must be serious. 4C FRANCIS M. HANNA, MISSOURI PRACTICE, TRUST CODE AND LAW MANUAL § 456.7–706 UTC Comment (2007); 2 RESTATEMENT

(THIRD) OF TRUSTS § 37 cmt. e (2003). "A serious breach of trust may consist of a single act that causes significant harm or involves flagrant misconduct." HANNA, *supra*, § 456.7–706 UTC Comment. A trustee will not be removed for every violation of duty or even breach of trust where the fund is in no danger of being lost. *State ex rel. Caulfield v. Sartorius*, 344 Mo. 919, 130 S.W.2d 541, 546 (Mo. banc 1939)(quoting *Miss. Valley Trust Co. v. Buder*, 47 F.2d 507, 511 (8th Cir.1931)); *Shelton*, 119 S.W.2d at 954 (quoting 1 PERRY ON TRUSTS § 276, notes 93, 94 (7th ed.)). Instead, clear necessity for interference to save trust property must exist. *Id.*

In removing Mr. Vivion and Mr. McGonegal for serious breach of trust, the trial court found that their participation in the decision, after Mrs. Weldon became incapacitated, to pay Gifford and Sally each $150,000 per year to "match" the salary being paid to Tony served no legitimate trust or business purpose and, thus, constituted a serious breach of trust.

The evidence showed that prior to her incapacitation, Mrs. Weldon requested Tony to become the manager and publisher of the Fulton Sun Gazette newspaper. Tony accepted the position in early 1998 earning a salary of $150,000 per year. Gifford and Sally were members of the WHC board of directors; and, unlike Tony, they did not hold any other position in any of the companies owned by WHC. Gifford earned approximately $30,000, and Sally earned $60,000. After Mrs. Weldon's incapacitation, Mr. Vivion and Mr. McGonegal, who were then co-successor trustees of Mrs. Weldon's Trust and also members of the WHC board of directors, voted with a majority of the WHC board to pay Gifford and Sally each $150,000 per year to match the salary of Tony. At trial, both Mr. Vivion and Mr. McGonegal testified that they made such decision because Gifford and

Sally were beneficiaries or heirs of Mrs. Weldon. In his deposition, which was admitted at trial, Mr. McGonegal testified as follows:

Q: Did you think that was a sound business decision to pay two people $150,000 that weren't really doing a whole lot?

A: Given that those people were going to be among the beneficiaries later, I had no problem with it. I mean, to me it was kind of a question of why should they be kind of living in half poverty now and when later on they are all going to be multi-millionaires.

Q: I guess the trust document doesn't give her three children anything until she dies, does it?

A: That's correct.

Q: And so why are you making the business decision to essentially distribute cash to these folks before Mrs. Weldon dies?

. . . .

A: Yeah. Call me—I don't know. Call me sentimental. I don't know. To me it's—

. . . .

A: I know this decision wasn't a popular one. It is what it is.

Q: And here's why—I appreciate that answer. I do. Here's what I'm getting at, though: You all say that we can't make it cashwise with Callaway Hills, so we have to shut it down. But you're willing to part with $300,000 a year to two folks who honestly don't do a whole lot. That's what I'm trying to figure out. Do you have any other explanation other than what we've already talked about? If you don't, I'll quit beating a dead horse.

A: I do not.

Section 456.8–801 governs the trustee's duty to administer the trust. It provides that "the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries." § 456.8–801. Additionally, section 456.8–802 mandates that "[a] trustee shall administer the trust solely in the interests of the beneficiaries." As previously discussed, the terms of the Trust provide that Mrs. Weldon is the primary beneficiary for life with her children receiving the Trust assets after her death. Upon Mrs. Weldon's incapacitation, the primary purpose of the Trust is to appropriately provide for her comfort, health, and general welfare. The Trust further evinces Mrs. Weldon's intent that Callaway Hills Stables remain in operation during her lifetime unless its sale is necessary to provide for her needs. Mr. Vivion and Mr. McGonegal's participation in the decision to pay $300,000 per year of Trust assets to Gifford and Sally, the same amount necessary to appropriately provide for Mrs. Weldon's needs, solely because they will one day be beneficiaries of the Trust revealed a lack of fidelity to the terms and purposes of the Trust. This is especially so in light of Mr. Vivion and Mr. McGonegal's position that Callaway Hills needed to be sold to maximize profits and minimize losses in WHC. Mr. Vivion and Mr. McGonegal's participation in the decision to pay $300,000 per year to Gifford and Sally served no Trust purpose and gratuitously expended substantial Trust assets constituting a serious breach of trust. The trial court did not err in removing Mr. Vivion and Mr. McGonegal as co-successor trustees. And because the trial court properly removed them based on serious breach of trust, its findings under subsections 2(2) and 2(3) need not be addressed.

■ The trial court also removed Tony as a co-successor trustee. It based its decision on lack of cooperation, subsection 2(2), and unwillingness or persistent failure to administer the trust, subsection 2(3). The trial court explained that "all three Co–Successor Trustees have never met, conferred or acted in their capacity as Co–Successor Trustees" and "[w]hile [Tony] is the least culpable of the three in this regard, all three Co–Successor Trustees must bear their share of the responsibility for the failure of the Trust to operate as a trust." The court also stated that Tony's removal was a close issue, and that her removal along with the two others and replacement with individuals not beneficiaries of the Trust would serve the best interests of all of the beneficiaries.

The key factor under subsection 2(2), lack of cooperation, is whether the administration of the trust is significantly impaired by the trustees' failure to agree. HANNA, *supra*, § 456.7–706 UTC Comment. "Unwillingness" under subsection 2(3) involves not only cases where the trustee refuses to act, but also "a pattern of indifference to some or all of the beneficiaries." *Id. See also* 2 RESTATEMENT (THIRD) OF TRUSTS § 37 cmt. e (2003).

The trial court's focus only on the lack of meetings between the co-successor trustees as a basis for Tony's removal was erroneous. The evidence revealed that after Mrs. Weldon became incapacitated, Tony, Mr. Vivion, and Mr. McGonegal did converse regarding Mrs. Weldon's care and various other issues. Although the evidence disclosed that the three co-successor trustees did not meet formally about the Trust, no evidence was presented that formal meetings were required to properly administer the Trust. No showing was made that provisions of the Trust went unimplemented. Instead, the evidence demonstrated that the purpose of the Trust, to provide for Mrs. Weldon's care, continued to be met. Furthermore, removal of Tony simply because she is a beneficiary under the Trust would violate the intent of Mrs. Weldon, who named Tony as a co-successor trustee despite her status as a future beneficiary of the Trust. Because no evidence was presented of misconduct by Tony relative to the Trust or its assets or that called into question Tony's capacity or fidelity to the Trust or its assets, the trial court erred in removing Tony as a co-successor trustee.

■ Next, Gifford and Sally challenge the trial court's appointment of the new co-successor trustees. They contend that under section 456.7–704.3 of the MUTC, the qualified beneficiaries must be given an opportunity, by majority vote, to appoint the successor trustees. Tony relies on sections 456.7–703.2 and 456.7–704.2 to argue that because she remains in office, the other vacancies in the trusteeship need not be filled at all. These sections govern cotrustees, vacancies in trusteeships, and the appointment of a successor. Section 456.7–703.2 provides, "If a vacancy occurs in a cotrusteeship, the remaining cotrustees may act for the trust." Section 456.7–704.2 provides, "If one or more cotrustees remain in office, a vacancy in a trusteeship need not be filled. A vacancy in a trusteeship must be filled if the trust has no remaining trustee." Subsection 3 of section 456.7–704 provides the procedure for filling a vacancy in a trusteeship required to be filled:

A vacancy in a trusteeship required to be filled must be filled in the following order of priority:

(1) by a person designated in or pursuant to the terms of the trust to act as successor trustee;

(2) by a person appointed by a majority in number of the qualified beneficiaries; or

(3) by a person appointed by the court. § 456.7–704.3.

As held above, the trial court erred in removing Tony as a co-successor trustee because no legal justification existed to thwart Mrs. Weldon's intention that Tony act as a co-successor trustee upon her incapacitation. Because Tony, a cotrustee, remains in office, the vacancies in a trusteeship created by the removal of Mr. Vivion and Mr. McGonegal are not required to be filled. *See* § 456.7–704.2. As such, contrary to the contention of Gifford and Sally, the procedure under subsection 3 of section 456.7–704 for filling vacancies in a trusteeship required to be filled does not apply in this case.

Subsection 4, however, grants the trial court authority to appoint additional trustees even if a vacancy is not required to be filled. It provides that "the court, in exercising its inherent equity authority, may always appoint additional trustees if the appointment would promote better administration of the trust." HANNA, *supra*, § 456.7–704 UTC Comment. Specifically, it states, "Whether or not a vacancy in a trusteeship exists or is required to be filled, the court may appoint an additional trustee or special fiduciary whenever the court considers the appointment necessary for the administration of the trust." § 456.7–704.4. Thus, although the vacancies left by the removals of Mr. Vivion and Mr. McGonegal were not required to be filled under the MUTC because Tony remained in office, the trial court effectively exercised its inherent equity authority and appointed three new co-successor trustees to promote better administration of the Trust. It found that appointment of the "individuals who are not beneficiaries of the Trust and are not employed by corporations in the trust will help alleviate future problems in the administration of the Trust and facilitate an orderly administra-

tion of the Trust that will best serve the interests of all beneficiaries." The trial court did not err in appointing the three new co-successor trustees.

## CONCLUSION

The trial court did not err in construing the Trust as prohibiting the sale of Callaway Hills Stables during Mrs. Weldon's life unless such sale were necessary to enable the co-successor trustees to appropriately provide for Mrs. Weldon. It did err, however, in construing the Trust as necessarily compelling distribution of Callaway Hills Stables to a beneficiary upon final distribution of Trust assets.

Additionally, the trial court properly removed Mr. Vivion and Mr. McGonegal as co-successor trustees of the Trust for serious breach of trust under section 456.7–706.2(1). The trial court, however, erred in removing Tony as a co-successor trustee. Finally, the trial court did not err in appointing the three new co-successor trustees.

The judgment of the trial court is affirmed in part and reversed in part, and the case is remanded for entry of judgment consistent with this opinion.

HARDWICK, P.J. and NEWTON, J. concur.