

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

DONALD A. RIEAD, CO-TRUSTEE )
OF THE JOHN T. RIEAD, JR. )
REVOCABLE TRUST, ET AL., )
                             )
    Appellant-Respondents, )
                             )
v.                            )      WD85899 (Consolidated with
                             )      WD85916)
                             )
JOHN T. RIEAD III, CO-TRUSTEE )      Opinion filed:    December 19, 2023
OF THE JOHN T. RIEAD, JR. )
REVOCABLE TRUST, ET AL., )
                             )
    Respondent-Appellants, )
                             )
TIMOTHY RIEAD, )
                             )
    Respondent. )

## APPEAL FROM THE CIRCUIT COURT OF
## JACKSON COUNTY, MISSOURI
## THE HONORABLE MARK A. STYLES, JR., JUDGE

Division Four: Gary D. Witt, Chief Judge, W. Douglas Thomson, Judge
and Roger M. Prokes, Special Judge

Before this court are cross-appeals from a judgment entered by the Circuit

Court of Jackson County ("trial court") denying Appellants-Respondents' ("the

Beneficiaries") Amended Petition for Declaratory Judgment ("Petition") and

granting Respondent-Appellant's ("Riead III") Counterclaim. The Beneficiaries' appeal raises two points, as does Riead III's appeal. The appeals were consolidated, and the judgment is affirmed and remanded for the calculation of Riead III's appellate attorney fees.

## Factual and Procedural History[1]

John T. Riead, Jr. ("Settlor") executed a trust agreement to create the John T. Riead, Jr. Revocable Trust Dated July 10, 1995 ("the Trust"), wherein Settlor was designated as Trustee. The Trust was amended on June 26, 2000, followed by a second amendment on November 15, 2014 ("Second Amendment"). The Second Amendment made significant changes to the Trust. Among the changes was deletion of Article VII, which had allowed a majority of the beneficiaries to remove a Trustee. The Second Amendment replaced Article VII with the following pertinent language:

> I am the first trustee. When a vacancy occurs in the trusteeship and there is no remaining trustee, that vacancy shall be filled by my sons [Riead III] and Donald A. Riead or by the one of them who is willing and qualified to assume the trusteeship if the other is not.
> . . .
> Each trustee has the powers and duties given to a trustee by Missouri Uniform Trust Code. The trustee may sell any property of a trust during the period of time that the trust continues beyond the period of the rule against perpetuities that would apply to the trust but for subsection 1 of section 456.025 Revised Statutes of Missouri.

---

[1] "'In the appeal of [a] bench-tried case, the appellate court views the facts in the light most favorable to the trial court's judgment.'" *Lewis v. Lewis*, 671 S.W.3d 734, 737 n.2 (Mo. App. W.D. 2023) (alteration in original) (quoting *Schaffer v. Howard*, 624 S.W.3d 379, 381 n.1 (Mo. App. W.D. 2021)).

The Second Amendment also provided, "If this trust continues to the fifth anniversary of my death, the trustee shall end this trust after such anniversary when a majority of my then-competent children chooses to end it on a day that majority designates." In every version of the Trust, Riead III was named as a successor Trustee.

Settlor died on November 26, 2014, eleven days after executing the Second Amendment. In accordance with the Second Amendment, Riead III and Donald A. Riead ("Donald") became Co-Trustees. At the commencement of this action, the beneficiaries of the Trust were Settlor's six living children – Riead III, Sherry L. Riead ("Sherry"), Michael W. Riead, ("Michael"), Donald, Cynthia A. Harmer ("Cynthia"), and Timothy J. Riead ("Timothy")[2] – and the two children of Settlor's late daughter, who had predeceased her father.

Various property was held by the Trust upon Settlor's death, but the Trust assets at the time of trial were comprised of a checking account containing approximately $6,000, a savings account with approximately $46,200, and six rental duplexes and a house (occupied by the maintenance man) in Cameron. At the center of this litigation are the duplexes and discussions concerning their potential sale.

At the time of Settlor's death, Settlor's brother, Alan Riead ("Uncle"), was managing the duplexes. He continued doing so after Riead III and Donald became

___

[2] Due to several of the parties sharing the same last name, we refer to them by their first names throughout this opinion. No disrespect or informality is intended.

Co-Trustees. Uncle largely needed no assistance in the day-to-day management of the properties. If any significant decisions needed to be made regarding the property, Uncle would contact Donald. Donald also handled maintenance issues concerning the rental properties, as well as put together the different financial documents needed for tax purposes. Riead III was not involved in handling these various duties, but according to Uncle, his help was not needed in managing the property.

Uncle also did the overall bookwork for the Trust. Uncle and Donald worked together continuously throughout the administration of the Trust, during which Uncle would consult with Donald and provide him income and expense information. Uncle also wrote most of the checks for the Trust, although Donald and Riead III also had checkbooks for the Trust. In addition to these connections, Uncle, Settlor, and Donald were the sole members of Riead Home Construction, LLC, which was an ongoing business upon the death of the Settlor.

Upon becoming Co-Trustees, Riead III and Donald were both actively involved in settling Settlor's affairs. This included auctioning Settlor's personal property in 2015 and selling his personal residence in 2016. Riead III was also involved in writing checks, addressing existing liens and property sales, and closing out Settlor's pension. During this early part of the Trust, Riead III and Donald were in regular communication as Co-Trustees, discussing property sales and dividend checks. All beneficiaries were getting along.

4

In 2017, Riead III expressed negative emotions about his role as Trustee. He was discouraged and upset due to feelings of being excluded from decision-making and Donald "making calls without consulting [him]." This stemmed from Donald deciding, without consulting Riead III beforehand, to write a check for $822.50 from the Trust account to assist a relative. This led to a May 21, 2017 email from Riead III to Donald, in which he stated he was legally pursuing being removed as a Trustee.[3] Riead III never followed through with these actions, however.[4]

In November of 2017, another Trust property was sold and Riead III signed the closing paperwork as a Trustee. Following this 2017 sale, all debt on the Trust

---

[3] Around this same time, Riead III had also paid for bank statements concerning the Trust because he had not been receiving them, despite having access to the Trust's checking account records as a Co-Trustee. Similarly, Riead III was not on a separate maintenance account and was therefore unable to receive bank statements pertaining to it as well. Riead III only received access to the maintenance account through the present litigation.

In later emails in March of 2019, Riead III expressed similar negative feelings towards the Trust and his role as Co-Trustee. However, Riead III never resigned, and he attributed these statements to frustrations in his role as Co-Trustee and his response to a particular email sent by Michael on March 5, 2019, in which Michael had accused Riead III of "endless bullying" in regards to selling the Trust properties.

[4] For context, it is important to understand the complexities of later-discovered liens and the difficulties they created for the Co-Trustees. It appears there was some "creative" financing by Settlor following the 2008 housing market crash. In particular, it appears that at that time, Riead Home Construction, LLC had built fifteen new speculative homes. In order to protect certain financial interests of Settlor, it appears four of those new homes were traded for four "distressed" homes, which were then used as security in financing the duplexes. These four homes were in various locales, from Cameron to near the Kansas City International Airport, and two of said homes were apparently occupied thereafter by two of the beneficiaries. In trying to remove the liens from these non-Trust properties, the Co-Trustees apparently realized significant structural problems concerning two of the distressed homes or their curtilage, as well as a boundary dispute upon which there was a collapsing retaining wall. It is important to consider Riead III's expressions of discontent in his role as Co-Trustee in light of what he encountered upon becoming a Co-Trustee.

property was thought to have been paid off. Uncle continued to manage the duplexes and complete most of the bookwork, and regular distributions of Trust income to the distributees from the duplex rents began.

Discussions concerning the sale of the duplexes commenced in 2018. In an October 20, 2018 email to the beneficiaries, Donald stated "[w]e are at a crossroads at this time assuming everyone will want to sell the estate off at some point in the future." An offer to purchase two of the duplexes had been made, and the beneficiaries needed to decide how to move forward. Pursuant to the Trust, a unanimous decision was needed to sell the Trust property and three options were provided in the email: the first, to sell the duplexes steadily; the second, to sell all the duplexes to a local investor at a bargain price; and the third, to market the duplexes to out-of-town investors. Attached to the email was a link for the beneficiaries to make an anonymous vote, the result of which was a majority decision to hold the properties and not sell.

In 2019, a flurry of discussions concerning the Trust began. In March of 2019, Riead III requested that Donald provide him copies of the Trust documents. In response, Donald sent an email to all beneficiaries attaching the Trust documents and including information concerning the then-current state of the Trust. The email reiterated that the majority vote was to continue with the Trust holding the properties and to not actively market them. Also in 2019, it was discovered that two non-Trust properties had liens against the Trust, something not previously known.

Around this time, Riead III met with a lawyer concerning the Trust. He was concerned about how hastily the Second Amendment had been created before Settlor's death and felt the Trust needed to be examined considering the approaching fifth anniversary of Settlor's death. Riead III also had questions about changing Amendments to the Trust so that his wife, Cheryl Riead, would be able to receive his portion of the estate upon his death, but he was told the Trust could not be amended or changed. At the meeting with the attorney, Riead III was also advised by counsel that he and Donald should have been providing the Trust's financial information to the beneficiaries, something they had not been doing prior to that point. Riead III had wanted Donald to join him at this consultation, but Donald had told him to go alone, "take notes and get back with [him]." In May of 2019, Riead III wrote a check from the Trust account for the consultation in the amount of $258.50.

Riead III informed Donald and Uncle about this consultation and the information discussed. Riead III also informed the beneficiaries of this consultation in a March 18, 2019 email, in which he also stated he and Donald would be providing them financial information concerning the Trust, as they were legally obligated to do, and which he later did. At no time prior to 2021 did Donald or any of the beneficiaries object to or complain about Riead III's legal consultation and the payment for same, which was included as an expense on the statement he provided the beneficiaries.

Additionally, in the March 18, 2019 email, Riead III informed the beneficiaries that the fifth anniversary of Settlor's passing was approaching, meaning a vote on whether to continue the Trust would need to take place by November of 2019, per the Second Amendment's language. Throughout the email, Riead III stated each beneficiary must make their own decision, which he would respect as Co-Trustee.

More communication concerning the Trust took place in November of 2019, just ahead of the fifth anniversary of Settlor's passing. A November 12th email from Donald to the beneficiaries discussed the two, newly-discovered liens against the Trust. In addition, Donald and Michael were requesting a loan from the Trust to make repairs on one of the non-Trust properties in order to expedite its sale or refinancing. This was followed by a November 23rd email from Riead III, wherein this request, the liens, and the need for a vote on both the loan request and whether to liquidate the Trust were outlined. Riead III personally wanted to see the liens removed in order to sell the duplexes at a better price, further stating he and Uncle had discussed that the best way to sell the duplexes was to sell all six at one time to an outside investor. Riead III instructed the beneficiaries to email their votes. He stated the beneficiaries did not need to explain the reasoning behind their individual votes; he was "going to do [his] best to keep peace within the family. There should not be any hard feelings."

Following discussions amongst the beneficiaries, a majority voted to not sell the duplexes at that time, with the ultimate plan to resolve the liens, put together

a marketing plan, and sell them as a group. The parties were ultimately in agreement on this plan, including Riead III, who had wanted to sell the duplexes and liquidate the Trust at that time. The decision of whether or not to sell the properties was tabled.

Since the end of 2019, as agreed, no attempts or steps were taken to sell the Trust property, nor were any further votes taken. The only activity that occurred during this time was the removal of one of the liens through the sale of non-Trust property, as well as efforts to clear the remaining lien. In 2020, Donald was diagnosed with a terminal brain tumor. The family appeared to get along during this time.

This all changed in early 2021. On February 26, 2021, an email from another brother of Settlor, Bill Riead ("Bill"), was sent to the beneficiaries in which he accused Riead III's wife of pushing to sell the Trust properties and hiring a lawyer to do so. Bill had not been involved in trust business prior to this email. Bill stated that prior to his death, Settlor told Bill he did not want the properties sold, and Bill had promised Settlor he would protect the Settlor's wishes, and informed the beneficiaries he had hired an attorney to do so. A letter from this attorney, dated February 25, 2021, was also attached, which discussed, among other things, the multiple ways Riead III had allegedly violated his duties as Trustee.

Soon thereafter, Donald retained counsel ("the Beneficiaries' attorney").[5] On March 4, 2021, the Beneficiaries' attorney emailed Riead III and Timothy,

---

[5] Donald's attorney became the Beneficiaries' attorney.

attaching a recent letter in which four of the beneficiaries – Sherry, Michael, Donald, and Cynthia – had voted by signature to not sell the Trust properties. The March 4th letter indicated that Riead III and Timothy "may sign or not sign . . . it's up to you, it will not matter. The will of the majority has spoken . . . ."[6] Riead III and Timothy had been left out of the discussion preceding this vote and ultimately did not sign this "not-sell" document.

Following this, another discussion between the beneficiaries occurred, this time about removing Riead III as Trustee. Again, Riead III and Timothy were excluded from the discussion. On March 11, 2021, another letter from the Beneficiaries' attorney was sent to the beneficiaries regarding the replacement of both Riead III and Donald as Co-Trustees with Michael and Sherry, respectively. The stated reason for such action was Riead III's alleged breach of fiduciary duties, namely his "misappropriation of funds in hiring a lawyer in an attempt to force the sale of the income properties left to the children of [Settlor] and paying the attorney with Trust funds and not informing the siblings," i.e., the $258.50 paid by Riead III for consultation regarding the Trust. The letter further stated that Riead III was required to reimburse the allegedly misappropriated money and turn over the Trust's checkbook. The letter further advised Donald was voluntarily stepping down due to his health. The same four beneficiaries that had initially voted on March 3rd to not sell the Trust properties voted to replace Riead III and Donald as

---

[6] Timothy's vehement disapproval of Bill's email, and seeming support of Riead III as Co-Trustee, appeared to place him at odds with the remainder of the beneficiaries.

Co-Trustees. Riead III and Timothy again did not vote, and Riead III did not accept the vote or the stated demands.

On April 15, 2021, Donald, Sherry, Michael, and Cynthia filed their initial Petition for Declaratory Judgment in Jackson County against Riead III and Timothy.[7] Thereafter, the Beneficiaries filed their First Amended Petition for Declaratory Judgment on December 28, 2021, seeking the "removal of . . . Riead III as trustee, return of the trust checkbook, and reimbursement to the trust of trust assets he has used for his own self-serving interests and those of his wife and reimbursement for Petitioners' attorney fees, expenses of litigation and costs." As grounds for removal, the Beneficiaries alleged the following conduct by Riead III as violations of Missouri law and his fiduciary duty to the Trust and the beneficiaries:

> a.) failing to administer the trust in good faith and in the interests of all the beneficiaries.

---

[7] On April 23, 2021, five days prior to being served with this petition and unaware of its filing, Riead III had filed a Statement to Register the Trust in Livingston County. Riead III later filed a Petition for Advice and Construction as to Trust on May 6, 2021 in Livingston County concerning the same issues involved in the Jackson County litigation. On June 6, 2021, the Beneficiaries filed a joint motion to dismiss Riead III's Livingston County Petition or in the alternative to transfer to Jackson County, after which the Livingston County court dismissed Riead III's Petition, but found that the Trust is registered in Livingston County.

After filing their petition, in June of 2021, the Beneficiaries signed a Declaration of Beneficiaries substituting Michael in place of Donald as Co-Trustee due to Donald's health. The Beneficiaries stated they did not trust Riead III to be the sole Trustee. A motion to substitute Michael in place of Donald was thereafter filed in Jackson County, which the trial court denied. Later, the Beneficiaries filed a renewed motion to replace Donald with Michael as Co-Trustee which was again denied.

b.) using his position as co-trustee for his and his wife's own personal interests which were contrary to the interests of the majority of beneficiaries and co-trustee, Donald . . . .

c.) acting surreptitiously for his and his wife's own personal interests contrary to the interests of the majority of beneficiaries and co-trustee, Donald . . . .

d.) seeking legal advice and assistance to serve his and his wife's own personal interests which were contrary to the interests of the majority of beneficiaries and co-trustee, Donald . . . .

e.) using trust funds to pay for legal advice and assistance to serve his and his wife's own personal interests which were contrary to the interests of the majority of beneficiaries and co-trustee, Donald . . . .

f.) applying pressure on co-trustee, Donald . . . , to support his and his wife's own personal interests while Donald . . . , during all this time, has been suffering with terminal brain cancer.

g.) causing dissent and division among the beneficiaries who are also family members.

h.) refusing to accept the will of the majority of beneficiaries in voting him out as co-trustee and forcing them to take legal action.

i.) refusing to return the trust checkbook to co-trustee, Donald . . . , forcing legal action.

j.) refusing to reimburse the Trust for trust assets he used for his and his wife's own personal interests, forcing legal action.

k.) filing the Trust documents in the Probate Court of Livingston County after this lawsuit was on file in Jackson County, MO and representing to the Livingston County Court that he was the sole trustee of the Trust.

l.) failing to advise the Livingston County Probate Court that this lawsuit for Declaratory Judgment was already on file in Jackson County, Missouri.

m.) filing and pursuing a lawsuit in Livingston County Probate Court with knowledge that this lawsuit was on file in Jackson County, Missouri.

n.) hiring an attorney to represent him in his personal capacity and supposedly to represent the Trust at the same time, which is a clear conflict of interest for both him and his attorney.

12

o.) entering into a fee agreement with his attorney that involves the Trust becoming liable for his attorney fees.

p.) failing to agree to the replacement of Donald . . . , who has devasting disabilities from terminal brain cancer, with Michael . . . .

Both Riead III and Timothy filed Answers, with Riead III including a Counterclaim requesting instructions from the trial court.

A bench trial was held over three days, beginning on May 2, 2022. Findings of fact and conclusions of law were requested and granted. Both parties submitted motions for attorney fees and expenses. The trial court subsequently entered its judgment denying the Beneficiaries' Petition, granting Riead III's Counterclaim, ordering that Riead III shall serve as sole Trustee, and ordering that all parties' attorney fees be paid from the assets of the Trust, a total amount in excess of $120,000.[8]

Both the Beneficiaries and Riead III appeal. Additional facts will be provided below, as necessary.

## The Beneficiaries' Appeal[9]

The Beneficiaries raise two points on appeal. In Point I, they claim the trial court abused its discretion in denying their Petition, as well as their motion to

---

[8] Between trial and entry of judgment, Donald died as a result of his brain cancer.

[9] Riead III has filed a Motion to Dismiss Appeal due to failures by the Beneficiaries to comply with Rule 84.04's briefing requirements. Said motion is taken with the case, and after due consideration, is denied. "[I]t is never this court's preference to dismiss an appeal without reaching the merits." *E.K.H.-G. v. R.C.*, 613 S.W.3d 449, 454 (Mo. App. E.D. 2020) (quoting *Waller v. Shippey*, 251 S.W.3d 403, 406-07 (Mo. App. W.D. 2008)). That is true here where we can discern from the Beneficiaries' arguments their claims of error, and notably, Riead III is able to identify the claims of the Beneficiaries as we do. We therefore address the Beneficiaries' points *ex gratia* as best we can.

replace Donald as Co-Trustee, because the rulings are against the weight of the evidence and misstate or misapply Missouri law. Similarly, in Point II, they argue the trial court erred in granting Riead III's Counterclaim because it is not supported by substantial evidence, it is against the weight of the evidence, and it is contrary to Missouri statutes prescribing the duties of trustees and remedies for violations thereof.

Our standard of review for both of the Beneficiaries' points is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). *See Williams v. Duncan ex rel. Pauline M. Babcock, Living Trust*, 55 S.W.3d 896, 900 (Mo. App. S.D. 2001). Accordingly, we will affirm the trial court's judgment "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy*, 536 S.W.2d at 32. We review questions of law *de novo*. *Betty G. Weldon Revocable Trust ex rel. Vivion v. Weldon ex rel. Weldon*, 231 S.W.3d 158, 173 (Mo. App. W.D. 2007) (citations omitted).

## A. Point I

In their first point on appeal, the Beneficiaries claim error with the trial court's denial of their Petition and their motion to replace Donald as Co-Trustee, asserting the trial court abused its discretion in so ruling. They specifically argue:

> [T]he rulings are against the weight of the evidence and misstate or misapply Missouri Law in that substantial evidence supports the . . . Petition and Motion, the rulings are against the weight of the evidence proving . . . Riead III's violations of his fiduciary duties and the rulings are contrary to Missouri

14

Statutes comprising the Missouri Probate Code[10] which prescribe the duties of trustees and remedies for violations of those duties.[11]

In denying the Beneficiaries' Petition, the trial court found the Beneficiaries "failed to provide the Court with any credible or competent evidence" establishing Riead III violated his fiduciary duty to not act solely in his own interests and his duty to act in the interests of the beneficiaries. The court also found that "the record is almost void of any evidence to show that damage to the Trust or to the beneficiaries of the Trust was caused by the alleged breaches of . . . Riead III, while serving as co-trustee."

"The power of a court to remove a trustee should be used sparingly. Before such power is exercised, misconduct showing want of capacity or of fidelity jeopardizing the trust must be evident." *Weldon*, 231 S.W.3d at 178 (citations omitted). "'The removal of a trustee calls for the exercise of sound judicial discretion, which should not be abused.'" *Id.* (quoting *Shelton v. McHaney*, 119

---

[10] We presume the Beneficiaries meant the Missouri Uniform Trust Code ("MUTC"). All statutory citations are to RSMo (2016), as updated through the 2021 Cumulative Supplement.

[11] The Beneficiaries' first point is multifarious, as it states two *Murphy* grounds for reversal: against the weight of the evidence and misstatement or misapplication of law. "We can reverse a judgment 'only on a *Murphy* ground.'" *Interest of S.M.W.*, 658 S.W.3d 202, 212 (Mo. App. W.D. 2022) (quoting *Smith v. Great Am. Assur. Co.*, 436 S.W.3d 700, 704 (Mo. App. S.D. 2014)). "'If a point on appeal fails to identify which one of the *Murphy v. Carron* grounds applies, Rule 84.04 directs us to dismiss the point.'" *Id.* (quoting *Ebert v. Ebert*, 627 S.W.3d 571, 580 (Mo. App. E.D. 2021)) (citing Rule 84.04(d)(1)). Nevertheless, "[w]e do have discretion to review non-compliant briefs *ex gratia* when the argument is 'readily understandable.'" *Id.* at 212-13 (quoting *Ebert*, 627 S.W.3d at 585) (other citation omitted). This is preferable where, as here, "we are able to decipher the argument being made by the appellant without becoming an advocate for the appellant[.]" *State v. Clark*, 503 S.W.3d 235, 237 (Mo. App. W.D. 2016). We therefore exercise our discretion to review the Beneficiaries' first point.

15

S.W.2d 951, 954 (Mo. banc 1938)). Section 456.7-706 of the Missouri Uniform Trust Code ("MUTC") governs the removal of a trustee, providing in relevant part:

1. The settlor, a cotrustee, or a qualified beneficiary may request the court to remove a trustee, or a trustee may be removed and replaced by the court within its discretion on its own initiative.

2. The court within its discretion may remove and replace a trustee under the following circumstances:

(1) the trustee has committed a serious breach of trust;

(2) lack of cooperation among cotrustees substantially impairs the administration of the trust;

(3) because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the interests of the beneficiaries; or

(4) the trustee has substantially and materially reduced the level of services provided to that trust and has failed to reinstate a substantially equivalent level of services within ninety days after receipt of notice by the settlor, a cotrustee, or a qualified beneficiary or removal is requested by all of the qualified beneficiaries and in either such case the party seeking removal establishes to the court that:

(a) removal of the trustee best serves the interests of all of the beneficiaries;

(b) removal of the trustee is not inconsistent with a material purpose of the trust; and

(c) a suitable cotrustee or successor trustee is available and willing to serve.

"A breach of trust is a violation by a trustee of a duty the trustee owes to a beneficiary." *Weldon*, 231 S.W.3d at 179 (citing § 456.10-1001.1). "A trustee will not be removed for every violation of duty or even breach of trust where the fund

16

is in no danger of being lost. Instead, clear necessity for interference to save trust property must exist." *Id.* (internal citations omitted).

The Beneficiaries' claim in Point I centers on Riead III's alleged breaches of fiduciary duties. "To prevail on a breach of fiduciary duty, a plaintiff must show: (1) the existence of a fiduciary duty; (2) a breach of that fiduciary duty; (3) causation; and (4) harm." *Robert T. McLean Irrevocable Trust u/a/d March 31, 1999 ex rel. McLean v. Ponder*, 418 S.W.3d 482, 490 (Mo. App. S.D. 2013) (citing *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 411 (Mo. App. W.D. 2000)). "The element of harm or damages cannot 'rest upon guesswork, conjecture, or speculation beyond inferences that can reasonably decide the case[.]'" *Id.* at 496 (alteration in original) (quoting *Englezos v. Newspress and Gazette Co.*, 980 S.W.2d 25, 30 (Mo. App. W.D. 1998)).

We begin with the Beneficiaries' against-the-weight-of-the-evidence claim. "A court will set aside a judgment as 'against the weight of the evidence' only when it has a 'firm belief that the judgment is wrong.'" *Houston v. Crider*, 317 S.W.3d 178, 186 (Mo. App. S.D. 2010) (quoting *Gifford v. Geosling*, 951 S.W.2d 641, 643 (Mo. App. W.D. 1997)).

> [A]n against-the-weight-of-the-evidence challenge requires completion of four sequential steps:
>
> (1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;
>
> (2) identify all of the favorable evidence in the record supporting the existence of that proposition;

(3) identify the evidence in the record contrary to the belief of that proposition, resolving all conflicts in testimony in accordance with the trial court's credibility determinations, whether explicit or implicit; and

(4) demonstrate why the favorable evidence, along with the reasonable inferences drawn from that evidence, is so lacking in probative value, when considered in the context of the totality of the evidence, that it fails to induce belief in that proposition.

*Id.* at 187.

The Beneficiaries fail to follow this analytical framework. This is most evident in their failure to identify *any* evidence favorable to the trial court's finding that Riead III did not breach his fiduciary duty, nor its finding that the record was almost void of evidence of damage. Such favorable evidence is replete throughout the record.

For example, the Beneficiaries completely omit the Second Amendment's language, particularly its provisions on Trustees and their powers, as well as its deletion of the majority of the Trust's previous provisions, including Article VII regarding the ability of a majority of the beneficiaries to remove a Trustee. Indeed, the Second Amendment provides that a vacancy in the trusteeship "*shall* be filled by [Riead III] and [Donald] or by the one of them who is willing and qualified to assume the trusteeship if the other is not." (Emphasis added). And, the Second Amendment specifically states that "[e]ach trustee has the powers and duties given a trustee by [the] Missouri Uniform Trust Code[,]" as well as that "[t]he trustee may use property of this trust to pay . . . expenses relating to administering [the] estate." With the deletion of Article VII, the Beneficiaries had no authority to vote to remove Riead III as Trustee, meaning there was no vacancy in the trusteeship

18

and Riead III still had the powers of a Trustee as provided in the Second Amendment, including, among many others, the power "to engage and compensate attorneys," pursuant to § 456.8-816(25) of the MUTC.

Evidence was also adduced that Riead III was active in his role as Co-Trustee in the administration of the Trust when the various financial transactions with non-trust assets were addressed, and employed *Uncle* to manage the property on behalf of the Trust and write most of the checks. Additionally, there was evidence that Riead III's legal consultation in 2019 pertained to questions concerning the administration of the Trust and was of benefit to the beneficiaries. Notably, after such consultation, and as a result of it, Riead III began providing the Trust's financial information to the beneficiaries for the first time. Moreover, there was testimony that Riead III informed Donald of, and even invited him to, the meeting beforehand. The beneficiaries were also informed of this meeting, and no complaints about the meeting or Riead III's payment for it were lodged until two years later in 2021. Notably, Donald testified that the $822.50 check he wrote in 2017 – an amount greater than Riead III's $258.50 check – was *not* material or substantial to the administration of the Trust.

Further, there is evidence that Riead III made no efforts to sell the Trust property following the votes to not sell. In fact, the record showed that Riead III agreed with the majority's plan, and that discussions about selling the property were tabled at the end of 2019. The evidence showed distributions of profit were

19

made to the beneficiaries every year, and that the family was getting along up until Bill's letter in February of 2021.

The Beneficiaries completely ignore these facts and others, choosing instead to discuss only those which they believe demonstrate multiple violations by Riead III of his fiduciary duties to the Trust and its beneficiaries. Having failed to satisfy this second analytical step, the Beneficiaries consequently "doom their ability to satisfy the last step of [the] challenge." *Houston*, 317 S.W.3d at 188. Indeed, without identifying any favorable evidence, the Beneficiaries are unable to demonstrate *why* that evidence is lacking in necessary probative value.

> To support a favorable decision for [the Beneficiaries] on this point would require this Court to devise and articulate its own demonstration of how the omitted favorable evidence . . . is lacking in probative value as compared to the totality of the evidence, so as to be against the weight of the evidence. Such action on our part would thrust us into becoming an advocate on [the Beneficiaries'] behalf; a role we are prohibited from assuming.

*Id.* at 189 (citation omitted). This renders their entire against-the-weight-of-the-evidence challenge analytically useless. *Id.* at 188-89. Accordingly, it must fail.

We are also unconvinced by the Beneficiaries' statutory argument, as it fails to address the element of harm. Indeed, the Beneficiaries simply cite sections of the MUTC prescribing various fiduciary duties of a trustee and assert that in "[a]pplying these statutes to the evidence in this case, it is clear that . . . Riead III violated his fiduciary duties to the Trust and to the other beneficiaries multiple times." But that is where their argument ends. They fail to explain *how* Riead III's alleged breaches harmed or damaged the Trust or the beneficiaries. In fact, the Beneficiaries completely avoid any discussion of the element of harm or damage.

20

Notably, the trial court found "the record is almost void of any evidence to show that damage to the Trust or to the beneficiaries of the Trust was caused by the alleged breaches of . . . Riead III, while serving as co-trustee."

It is not our role to go searching through the record for what that harm or damage may have been. *See Ponder*, 418 S.W.3d at 496. In not directing us to any evidence pertaining to the necessary element of harm, the Beneficiaries have not proven that Riead III's alleged breaches of fiduciary duties caused harm or damage to the Trust or its beneficiaries. Stated differently, the Beneficiaries have not shown that the fund is in danger of being lost or has been jeopardized due to Riead III's alleged breaches. *Weldon*, 231 S.W.3d at 178-79 (citations omitted). Thus, the Beneficiaries' claim cannot prevail. *See Ponder*, 418 S.W.3d at 496.

The Beneficiaries' first point is denied.

## B. Point II

The Beneficiaries' second point on appeal contends the trial court erred in granting Riead III's Counterclaim, arguing:

> [I]t is not supported by substantial evidence, it is against the weight of the evidence and admissions of . . . Riead III under oath at trial proving [his] violations of his fiduciary duties and it is contrary to Missouri Statutes comprising the Missouri Probate Code[12] which prescribe the duties of trustees and remedies for violations of those duties.[13]

---

[12] *See supra* note 10.

[13] Like their first point, the Beneficiaries' Point II states more than one *Murphy* ground for reversal and is thus multifarious. Nevertheless, as we did with Point I, we choose to exercise our discretion to review the merits of Point II.

Within his Counterclaim, Riead III requested that the trial court enter an order

instructing and advising the Beneficiaries as follows:

> a. [Riead III] as co-trustee requests the Court ascertain and determine that Article VII of the Trust has been revoked and the Trust Beneficiaries have no right to remove . . . Riead III as co-trustee pursuant to the revoked Article VII.

> b. [Riead III] as co-trustee requests the Court ascertain and determine that he is still a co-trustee under the Trust as amended and so instruct the other Trust Beneficiaries.

> c. [Riead III] as co-trustee requests the Court ascertain and determine that as a co-trustee he has no obligation to turn over the Trust assets to the Trust Beneficiaries who have demanded the same.

> d. [Riead III] as co-trustee requests the Court ascertain and determine that the seeking of legal advice as co-trustee and the payment of $258.50 for such advice was not a breach of fiduciary duties and certainly not a material breach of his duties which would require his removal as co-trustee.

> e. [Riead III] as co-trustee requests the Court ascertain and determine that as a co-trustee he has the powers stated in the Second Amendment and such powers grant to him the right to discuss the possible sale of real property owned by the Trust.

> f. [Riead III] as co-trustee requests the Court to order the other co-trustee to cooperate with him by providing, upon reasonable request, financial information on the Trust property by consulting with him and obtaining his prior approval for payment of Trust expenses and distributions, and to instruct the property manager to communicate and cooperate with . . . Riead III as co-trustee in the management of the Trust property.

> g. [Riead III] further, pursuant to Section 456.10-1004 RSMo, requests the Court award him his costs and expenses from the [Beneficiaries] or alternatively from the Trust estate.

> h. [Riead III] further requests such other and further relief as to [sic] the Court seems just and proper.

We first address the Beneficiaries' substantial evidence claim.

> "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of fact[] can reasonably decide the case."

22

*Williams v. Daus*, 114 S.W.3d 351, 359 (Mo. App. 2003) (internal citations and quotations omitted). We view the evidence and the reasonable inferences drawn from the evidence in the light most favorable to the judgment, disregard all evidence and inferences contrary to the judgment, and defer to the trial court's superior position to make credibility determinations. *Landers* [*v. Sgouros*], 224 S.W.3d [651,] 655 [(Mo. App. S.D. 2007)]. Due to that superior position, "'a trial court is free to believe or disbelieve all, part, or none of the testimony of any witness.'" *Lueckenotte v. Lueckenotte*, 34 S.W.3d 387, 394 (Mo. banc 2001) (quoting *Burkhart v. Burkhart*, 876 S.W.2d 675, 678 (Mo. App. 1994)). Thus, any citation to or reliance upon evidence and inferences contrary to the judgment is irrelevant and immaterial to an appellant's point and argument challenging a factual proposition necessary to sustain the judgment as being not supported by substantial evidence. Such contrary facts and inferences provide no assistance to this Court in determining whether the evidence and inferences favorable to the challenged proposition have probative force upon it, and are, therefore, evidence from which the trier of fact can reasonably decide that the proposition is true. *See Williams*, 114 S.W.3d at 359.

*Houston*, 317 S.W.3d at 186. A not-supported-by-substantial-evidence challenge requires completion of certain steps:

(1) identify a challenged factual proposition, the existence of which is necessary to sustain the judgment;

(2) identify all of the favorable evidence in the record supporting the existence of that proposition; and,

(3) demonstrate why that favorable evidence, when considered along with the reasonable inferences drawn from that evidence, does not have probative force upon the proposition such that the trier of fact could not reasonably decide the existence of the proposition.

*Id*. at 187.

As in Point I, the Beneficiaries do not follow this framework and identify no favorable evidence. Instead of discussing only favorable evidence as required, the Beneficiaries simply refer us to the contrary evidence discussed in Point I, then include a list of "admissions" made by Riead III as additional contrary evidence.

23

Such evidence is irrelevant and immaterial in a not-supported-by-substantial-evidence challenge as we must examine the probative value of the *favorable* evidence. *Id.* at 186-87. Indeed, we are to "*disregard* all evidence and inferences contrary to the judgment, and defer to the trial court's superior position to make credibility determinations." *Id.* at 186 (emphasis added) (citation omitted). The Beneficiaries' not-supported-by-substantial-evidence challenge is thus analytically useless, as the exclusion of favorable evidence prevents the Beneficiaries from satisfying the third step of the analysis, that being a demonstration of why the favorable evidence, when considered along with the reasonable inferences drawn therefrom, does not have probative value. *Id.* at 187-88.

This necessarily means that the Beneficiaries' against-the-weight-of-the-evidence challenge also fails. As discussed in Point I, the analytical framework for that respective evidentiary challenge also requires identification of all favorable evidence supporting the existence of the necessary proposition. *Id.* at 187. The Beneficiaries have not cited any favorable evidence in their second point. Failing to do so, their argument is "strip[ped] . . . of any analytical value or persuasiveness." *Id.* at 189.

We are therefore left with the Beneficiaries' claim that the grant of Riead III's Counterclaim is contrary to the provisions of the MUTC pertaining to the duties of trustees and the remedies for violations thereof. However, nowhere within their argument do the Beneficiaries cite or even discuss provisions of the MUTC. Instead, they simply list Riead III's "admissions" as additional evidence

24

proving his "multiple serious breaches of fiduciary duties" and conclude "he was not fit to be a co-trustee, much less become the sole trustee."

Such conclusions, without tying in *any* provisions of the MUTC, not only fail to demonstrate how Riead III violated his fiduciary duties under the MUTC, they also fail to support the Beneficiaries' claim that the granting of the Counterclaim was contrary to the MUTC. *See Estate of Allen*, 615 S.W.3d 851, 855 (Mo. App. E.D. 2020) ("'Mere conclusions and the failure to develop an argument with support from legal authority preserve nothing for review'") (quoting *Porter v. Santander Consumer USA, Inc.*, 590 S.W.3d 356, 358 (Mo. App. E.D. 2019)); *Wallace v. Frazier*, 546 S.W.3d 624, 628 (Mo. App. W.D. 2018) ("When an appellant fails to support contentions with relevant law and analysis beyond conclusory statements, we deem the point abandoned") (citation omitted). Without more, the Beneficiaries do not "satisfy the 'fundamental requirement of an appellate argument, which is to demonstrate the erroneousness of the basis upon which the lower court issued an adverse ruling.[']" *Murphree v. Lakeshore Estates, LLC*, 636 S.W.3d 622, 625 (Mo. App. E.D. 2021) (quoting *Burgan v. Newman*, 618 S.W.3d 712, 715 (Mo. App. E.D. 2021)).

The Beneficiaries' second point is denied.

## Riead III's Appeal

Riead III's two points on his cross-appeal challenge as an abuse of discretion the trial court's award of the Beneficiaries' attorney's fees to be paid from the assets of the Trust. His first point argues the Beneficiaries' attorney's fees should have

been charged against them individually, or in the alternative against each challenging Beneficiary's share of the Trust, because they "litigated questions without reason, argued immaterial issues, and raised improper points creating delay and expense in the matter." His second point contends that the Beneficiaries' "litigation was not successful and pursuant to the common fund doctrine, [their] actions did not preserve or protect the trust for the benefit of all beneficiaries." Being interrelated, we address the points together.

> Where an award of attorney's fees is authorized by law, we review a trial court's award of fees for abuse of discretion. *Berry v. Volkswagen Grp. of Am., Inc.*, 397 S.W.3d 425, 430 (Mo. banc 2013). An award of attorney's fees is an abuse of discretion and requires reversal only if it is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.["] *City of Byrnes Mill v. Limesand*, 599 S.W.3d 466, 477 (Mo. App. E.D. 2020).

*Berezo v. Berezo*, 628 S.W.3d 737, 748 (Mo. App. E.D. 2021). "The trial court is an expert on attorney's fees and has discretion to determine the fee award." *Id.* at 750 (citation omitted). We therefore give deference to the trial court. *In re Gene Wild Revocable Trust*, 299 S.W.3d 767, 782-83 (Mo. App. S.D. 2009).

"Missouri has adopted the 'American Rule' which provides that 'absent statutory authorization or contractual agreement, with few exceptions, each party bears the expense of his or her own attorney's fees.'" *Id.* at 782 (quoting *Klinkerfuss v. Cronin*, 199 S.W.3d 831, 843 (Mo. App. E.D. 2006)). Section 456.10-1004, however, states that "[i]n a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid

26

by another party or from the trust that is the subject of the controversy." In awarding the parties' attorney's fees to be paid from the Trust, the trial court recognized this statutory authority and found:

> [T]he claims and counterclaims pursued by the co-trustees against each other were not frivolous in nature, and that genuine, actual disputes did exist, and that there was no intentional misconduct or bad faith by the co-trustees or other beneficiaries. By making this finding, the attorney fees and costs of all parties should be paid from the assets of the Trust.

Riead III first claims this finding was an abuse of discretion because the Beneficiaries "filed the instant action capriciously and without reason, as the issues raised contain baseless accusations to remove [him] as Trustee . . . ." He argues that "[t]he issues alleged were immaterial and without merit," as shown by the evidence, the language of the Trust, the MUTC, and the trial court's judgment. He therefore contends that charging the cost of this "vexatious" litigation against the Trust "unfairly deplete[s] the Trust shares of the beneficiaries who did not instigate this action."

In making such an argument, Riead III relies on the "special circumstances" or "very unusual circumstances" exceptions to the American Rule. These exceptions are rare and confined to limited factual circumstances, including "where there has been intentional misconduct by a party." *Klinkerfuss v. Cronin*, 289 S.W.3d. 607, 618 (Mo. App. E.D. 2009) (citations omitted). Intentional misconduct by a beneficiary was found in *Klinkerfuss*, upon which Riead III relies, where the Eastern District was faced with the third appeal in a series of "relentless and vexatious litigation" by the beneficiary. *Id.* at 619. The litigation had stemmed

27

from a judgment in which the trial court had "found that none of the beneficiary's claims against the trustee had any merit and that she filed the lawsuit for selfish reasons rather than to protect the trust." *Id.* The beneficiary's continued pursuit of this "groundless and unsuccessful litigation[]" for her sole benefit was determined to be intentional misconduct, permitting the Eastern District to award attorney's fees on appeal against the beneficiary personally. *Id.* (quoting *Klinkerfuss*, 199 S.W.3d at 846).

Similar circumstances are not present here. The trial court explicitly found there was *no* intentional misconduct by the co-trustees or the other beneficiaries, and further held "the claims and counterclaims by the co-trustees against each other were not frivolous in nature, and that genuine, actual disputes did exist[.]" Riead III has not demonstrated this finding is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.["] *Berezo*, 628 S.W.3d at 748 (quoting *Limesand*, 599 S.W.3d at 477). Riead III points us to no conduct by the Beneficiaries, intentional or otherwise, demonstrating their litigation was vexatious or was sought for purposes other than seeking to protect the Trust, nor do we find any ourselves. The Beneficiaries' claims ultimately failed, as Riead III thoroughly explains in his argument, but we find nothing in the record constituting intentional misconduct in bringing said claims.

On the contrary, determination of the issues was beneficial to the Trust, as it "chart[ed] a course for the administration of the trust estate[,]" specifically

concerning the role of Trustee for the Trust. *Bernheimer v. First Nat. Bank of Kan. City*, 225 S.W.2d 745, 755 (Mo. banc 1949). It was therefore not an abuse of the trial court's discretion to award the Beneficiaries' attorney's fees to be paid from the Trust. *Cf. In re Gene Wild Revocable Trust*, 299 S.W.3d at 783 (holding it was within the probate court's discretion to award attorney's fees where the court reasoned the "litigation was brought and defended in good faith and there were issues raised which could only have been settled via judicial determination"); *Coates v. Coates*, 316 S.W.2d 875, 877-79 (Mo. App. 1958).[14]

Riead III's first point is denied.

Riead III's alternative argument regarding the common fund doctrine and the Beneficiaries' unsuccessful litigation also fails. With respect to the common fund doctrine, Riead III cites *Alexander v. UMB Bank, N.A.*, 632 S.W.3d 385 (Mo. App. W.D. 2021), which explains the doctrine as "permit[ting] a litigant to recover attorney's fees where the litigant recovers 'a common fund that benefited a trust with multiple beneficiaries.'" *Id.* at 393 (quoting *Trustees of Clayton Terrace Subdivision v. 6 Clayton Terrace, LLC*, 585 S.W.3d 269, 285 (Mo. banc 2019)). This means that a party may be "reimbursed for all of the legal services and expenses that benefited the . . . Trust, *i.e.*, the common fund[,]" but not for those attorney's fees and expenses that "were either for work done solely for [the party's] benefit or were excessive . . . ." *Id.* at 394. Riead III claims that because the

---

[14] We note that while *Bernheimer* and *Coates* pre-date the MUTC, they comport with the intent of the MUTC and thereby support the current law in this instance.

Beneficiaries' litigation was unsuccessful, it did not benefit the Trust or its beneficiaries, but instead harmed the Trust due to the amount of attorney's fees awarded from the Trust. He therefore asserts that pursuant to the common fund doctrine, the trial court abused its discretion in awarding the Beneficiaries' attorney's fees to be paid from the Trust.

However, the trial court awarded the attorney's fees pursuant to its statutory authorization under § 456.10-1004. Accordingly, "under the special statutory section at issue the probate court could within its discretion award attorney's fees 'to any party' regardless of whether that party prevailed in the lawsuit." *In re Gene Wild Revocable Trust*, 299 S.W.3d at 783 (citing § 456.10-1004). Further, "[t]his statute does not limit awards only to trustees or others whose actions benefitted a trust. Though fee awards normally will be limited to such parties, the statute imposes no such limitation. Instead, it leaves the award to the trial court's determination of what 'equity and justice' require." *Rouner v. Wise*, 446 S.W.3d 242, 260 (Mo. 2014). And, in accordance with our holding in Riead III's first point, we find the trial court did not abuse its discretion in awarding the attorney's fees as it did here.

Riead III's second point is therefore denied.

Riead III has filed a Motion for Attorney Fees on Appeal that was taken with case. After due consideration, the motion is granted, with such fees to be paid from the Trust. *See* § 456.10-1004. While we have the authority to allow and fix the amount of attorney's fees on appeal, we prefer to remand to the trial court to

30

determine the reasonableness of the fees requested. *See Rosehill Gardens, Inc. v. Luttrell*, 67 S.W.3d 641, 648 (Mo. App. W.D. 2002). As such, we remand to the trial court for the sole purpose of determining the amount of appellate attorney fees to be awarded to Riead III from the Trust. We further hold that the Beneficiaries are to bear the expense of their own appellate attorney fees.[15]

## Conclusion

For the foregoing reasons, the judgment is affirmed. The case is remanded for the sole purpose of determining the amount of appellate attorney fees to be awarded to Riead III from the Trust.

_____
W. DOUGLAS THOMSON, JUDGE

All concur.

---

[15] We note that included within the Beneficiaries' Suggestions in Opposition to Riead III's motion for fees is a "Writ of Mandamus" seeking an order for Riead III to pay quarterly dividends due and owing from the profits of the Trust to its beneficiaries. We do not treat this as a proper filing of a petition for writ of mandamus, as it is not in conformance with the requirements for same as set forth in Rule 94.03. Accordingly, it not being properly before us, we decline to address this request by the Beneficiaries.